FIRST CREDIT CORPORATION, Respondent, v. BEHREND, Appellant: BEHREND, Defendant.*

*No. 17. Argued November 26, 1969.—Decided December 19, 1969.*
(Also reported in 172 N. W. 2d 668.)

\* Motion for rehearing denied, with costs, on March 3, 1970.

For the appellant there were briefs and oral argument by *Alan C. Cole* of La Crosse.

For the respondent there was a brief and oral argument by *William J. Sauer* of La Crosse.

HEFFERNAN, J. The test applicable in reviewing the determination of facts made by a trial judge is whether the found facts rest upon evidence that is contrary to the great weight and clear preponderance of the evidence. *Kuehn v. Kuehn* (1960), 11 Wis. 2d 15, 20, 104 N. W. 2d 138.

If the issue is a factual one, and the finding is not contrary to the great weight and clear preponderance of the evidence, it must be sustained even though a reviewer of the record might find credible evidence pointing to a different finding.

If only a factual issue were here involved, the trial judge correctly found that the finance company relied upon the false financial statement. However, as we view the undisputed facts, a question of law is presented which we consider to be determinative of the case.

In August of 1966 William Behrend and his wife Barbara, both just twenty-one years old, moved from Maine to La Crosse, Wisconsin, leaving behind them approximately $2,000 of unpaid bills. Upon moving to La Crosse, they lived with an aunt, and for the first two weeks at least William was unemployed. He then managed to secure temporary work. His pay for such work was approximately $480 per month. Barbara was also employed and earning $100 per month. Late in September, the Behrends purchased furniture priced at $500 from the La Crosse Furniture Company. They were not able to pay the entire price. A down payment of $50 was made, and the conditional sales contract for the balance was sold to the plaintiff, First Credit Corporation.

About two weeks later (the exact date is in doubt), the Behrends decided to purchase a television set for $745 from the Wettstein Company. Wettstein's salesman testified that he attempted to sell the contract to First Credit, but the contract was refused because the Behrends could come up with only $50 instead of the $75 First

Credit required as a down payment. The plaintiff at this time made a partial credit check with the La Crosse Credit Bureau, and this revealed that there were two delinquent Behrend obligations in hands of collectors. As plaintiff's counsel stated, these amounts were for somewhat "less than $50" each. The eager salesman did not give up attempting to make the sale and that night visited the Behrends' home, where he found out that they had recently purchased furniture on a sales contract purchased by First Credit. He then called First Credit and urged that it combine the furniture and television sales in a single contract. First Credit declined to purchase the combined contract but told the salesman that it would extend a personal loan covering the furniture and the television if the Behrends' automobile was also put up as additional collateral. As the salesman stated, he did a "lot of foot work" to make the sale.

Subsequently, William and Barbara Behrend went to the finance company during William's forty-five minute lunch break, where they were interviewed by a Mr. Gorczyca, then First Credit's manager. He filled out a personal information questionnaire and then handed the Behrends "a form that had to be filled out on our financial situation and said it was self-explanatory."

Behrend filled in the information required at the top and bottom of the half-sheet form. He made no entry on the form following the words, "The only persons or companies to whom I owe money and their names and the amounts of each indebtedness are as follows." Behrend asked Gorczyca "if he wanted First Credit on there." Gorczyca replied, "yes . . . . he said list all of your debts." Barbara Behrend then stated, "We have no debts other than what you already know of."

Behrend then signed the form. Gorczyca took the form and instructed Barbara Behrend to write in the words, "I have no other debts." Barbara did so and then signed the statement.

The loan transaction was then completed. A note for $1,650 was executed by the Behrends. They received a check of $694 for Wettstein's and a check for $8 payable to them "to balance out the transaction."

The statement of the loan transaction appears in the record:

"Amount of note        $1650.00

| | | |
|---|---|---|
| Discount | 296.25 | |
| Service fee | 20.00 | |

Proceeds of loan after deducting discount and service fee     1333.75

| | | |
|---|---|---|
| Less three items of insurance | 30.94 | |
| | 62.70 | |
| | 88.00 | |

Leaving a remaining proceed of     $1152.11"

The note was payable in thirty installments of $55 each.

Behrend testified that, at the time of the execution of the financial statement, he did not know what debts Gorcyzca knew about. It is clear that the only debt alluded to in the conversation was the debt for the prior furniture purchase. It appears indisputable that this was the reason for listing First Credit as a prior creditor. As far as the record reveals, this was the only debt of which the Behrends knew that First Credit was aware.

The fact is, however, that First Credit knew of at least two additional debts that the Behrends had not revealed orally and were not listed on the financial statement. Exhibit 1, which the record shows was prepared at the time First Credit turned down the television contract purchase, shows that First Credit was informed that there were two outstanding and delinquent collections against the Behrends.

Accordingly, it is undisputed, and counsel for respondent conceded at oral argument, that plaintiff's agent knew, on the basis of facts in its own files, that the financial statement was false. First Credit knew that William and Barbara Behrend had debts not listed. True, these debts totalled less than $100. In addition, the financial statement had omitted other debts incurred in the east that totalled approximately $2,000. As acknowledged at oral argument by counsel, First Credit knew that the statement was false and that the Behrends were lying. What First Credit did not know was the magnitude of the lie.

On February 29, 1968, William Behrend was granted a discharge in bankruptcy by the United States District Court at Madison, Wisconsin. The debt to First Credit was listed in the bankruptcy schedules. First Credit now contends that the debt incurred at the time of the giving of the false financial statement is not released by the discharge in bankruptcy by virtue of sec. 17 (a) of the Bankruptcy Act. 11 USCA, sec. 35 (a) (2). That portion of the United States Code provides in part:

"Sec. 35. **Debts not affected by a discharge.**

"(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . . (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive . . . ."

The Behrends concededly executed a materially false statement in writing respecting their financial condition with the intent to deceive. Only one question is at issue —was the credit given in "reliance" upon the false statement. The trial judge so found, and considering the

testimony of First Credit's manager that he did indeed rely on the statement, the trial judge's findings are not against the great weight and clear preponderance of the evidence.

But the question here presented is a legal one—can one "rely" upon a financial statement that is known to him to be false. The answer is clear—one cannot, even though the falsity of the statement was more extreme than known at the time by the recipient of the statement.

We will not "balance the equities," if such they can be called, between a borrower who was willing to utter a great falsehood and a lender who was willing to accept a little lie, even though it is clear that the lie contained in the financial statement probably exceeded the magnitude of dishonesty that the finance company apparently considered tolerable and condonable.

It is apparent that the known falsehood relating to less than $100 of debts was deliberately overlooked as immaterial, since it would not have affected the ability to pay, while a knowledge of an unrevealed $2,000 debt might have resulted in a priority for other creditors and would, therefore, have stopped the loan transaction. We do not think the bankruptcy act conferred upon the creditor the power to determine subjectively that he could rely on a financial statement that he knew contained only a little lie, but then give him the discretion to object to a creditor's discharge if the falsehood was subsequently determined to be of such magnitude that had he known the full falsehood he would not have extended the credit. The materiality of the falsehood will not be left to the discretion of the creditor. He will not be heard to complain that he is deceived if he accepts a financial statement that he knows is partly false.

In this connection, where the creditor knowingly permits a debtor to submit a false statement, he will not later be heard to complain that by reason of the debtor's dishonesty he, the creditor, has been defrauded. Having

consented to the deception, he cannot take advantage of the bankruptcy laws which are designed to protect those who have been *innocently* deceived.

We believe that the question of "reliance" is governed by common-law fraud decisions. 37 Am. Jur. 2d, *Fraud and Deceit,* pp. 301, 302, sec. 226, summarizes this rule of law:

"It is fundamental that a representee must be deceived by false representations in order to make them actionable. It follows that in any fraud case, in order to secure relief, the complaining party must honestly confide in the representations or, as has been said, must reasonably believe them to be true. The law will not permit one to predicate damage upon statements which he does not believe to be true, for if he knows that they are false, it cannot truthfully be said that he is deceived by them. This principle is applicable, however false and dishonest the representations may be, and regardless of the fact that they are made with intent to deceive."

The same rule of law is incorporated in Wisconsin Jury Instructions—Civil, Part II, 2401:

"If you find, however, that the plaintiff or person to whom the representations were made knew them to be untrue, then there can be no justifiable reliance as nobody has the right to rely upon representations that he knew were untrue."

Prosser, in his discussion of reliance, adheres to the same reasoning. Prosser, *Law of Torts* (hornbook series, 3d ed.), Reliance, p. 729, sec. 103. He points out the plight of one who knows the error or should know falsity of a representation and then attempts to rely on it:

". . . one cannot be heard to say he relied upon a statement so patently ridiculous as to be unbelievable on its face, unless he happens to be that special object of the affections of a court of Equity, an idiot." (p. 732.)

Wisconsin cases stressing the obvious point that one cannot subsequently claim to have relied upon a repre-

sentation he knew was false are *Kaiser v. Nummerdor* (1904), 120 Wis. 234, 238, 97 N. W. 932; *Sievers v. Fuller* (1923), 181 Wis. 120, 193 N. W. 1002; *Lipman v. Manger* (1924), 185 Wis. 63, 200 N. W. 663; *Jacobsen v. Whitely* (1909), 138 Wis. 434, 120 N. W. 285; *Household Finance Corp. v. Christian* (1959), 8 Wis. 2d 53, 98 N. W. 2d 390; and *Williams v. Rank & Son Buick, Inc.* (1969), 44 Wis. 2d 239, 170 N. W. 2d 807.

The record gives no basis for questioning the motive of First Credit or its agents in knowingly accepting a false financial statement. Suffice it to say that the knowing acceptance of a false statement has been used as a device to secure a discharge-proof obligation. This odious practice was commented upon in Senate Report No. 1688, June 24, 1960, quoting from a report of the Judiciary Committee of the House:

"The committee believes that complete denial of a discharge is too severe a penalty in the case of the individual noncommercial bankrupt. It is also a penalty which experience has shown to be subject to abuse. An unscrupulous lender armed with a false financial statement has a powerful weapon with which to intimidate a debtor into entering into an agreement in which the creditor agrees not to oppose the discharge in return for the debtor's agreement to pay the debt in full after discharge. The creditor may also accomplish his purpose of preserving his debt by not opposing the discharge and then suing in a State court on the ground that the debt is not dischargeable. Testimony before the Subcommittee on Bankruptcy and Reorganization by experts in bankruptcy law indicates that unscrupulous lenders have frequently condoned, or even encouraged, the issuance of statements omitting debts with the deliberate intention of obtaining a false agreement for use in the event that the borrower subsequently goes into bankruptcy. . . .

"The purpose of this amendment is to assure that although the obtaining of money or property on credit through the issuance of a false financial statement is no longer to be ground for denial of a discharge to a nonbusiness bankrupt, any obligation incurred as a re-

sult of such a statement to be nondischargeable under section 17. The addition of the elements of reliance by the creditor and intent to deceive by the debtor are merely enactments of existing case law." *U. S. Code Congressional and Administrative News,* 86th Cong., 2d Sess., 1960, Vol. 2, pp. 2955, 2956.

The element of reliance was inserted into the 1960 amendment to the Bankruptcy Act to prevent such abuse. To conclude that one could accept a financial statement that is known to be false in part and to subsequently permit a claim of any reliance, would undo the very purpose of the amendment and leave the door open to the renewal of the vice that the 1960 amendment sought to correct. We conclude that in terms of sec. 17 (a) of the Bankruptcy Act, a creditor cannot claim that a debt incurred in a transaction involving a false financial statement is not discharged by a bankruptcy judgment if at the time of the transaction the creditor knew that the statement was false in whole or in part.

*By the Court.*—Judgment reversed.