**ALL–TECH TELECOM, INC.,**
**Plaintiff–Appellant,**

v.

**AMWAY CORPORATION,**
**Defendant–Appellee.**

**No. 98–2634.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1998.

Decided April 7, 1999.

---

Matthew A. Biegert (argued), Doar, Drill & Skow, New Richmond, WI, for Plaintiff–Appellant.

David Lucey (argued), Foley & Lardner, Milwaukee, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and MANION, Circuit Judges.

POSNER, Chief Judge.

A disappointed plaintiff, All–Tech Telecom, appeals from the district court's grant of summary judgment to the defendant, Amway, on All–Tech's claims of intentional and negligent misrepresentation and promissory estoppel. All–Tech was allowed to get to the jury on claims of breach of warranty, and the jury found a breach but awarded no damages. There is no challenge to the jury's verdict, only to the grant of summary judgment on the other claims. The basis of federal jurisdiction is diversity of citizenship, and the parties agree that the substantive issues are governed by Wisconsin law.

In 1987, Amway had offered distributors a new product (really a product plus a service), the "TeleCharge" phone. The phone was intended for the use of customers of hotels and restaurants. The customer would use a credit card or telephone calling card to pay for a long-distance call. The hotel or restaurant, along with the distributor, Amway, and the long-distance phone companies involved in the calls, would divide the line charges. Beginning in 1988, All–Tech, which was created for the very purpose of being an Amway distributor of TeleCharge phones and the associated telephone service, bought a large number of the phones. For a variety of reasons beyond All–Tech's control, including equipment problems, regulatory impediments to the provision of the TeleCharge program, and finally the obsolescence of the phones, which caused Amway to withdraw the product from the market in 1992, TeleCharge was a flop. All–Tech claims to have been lured into and kept in this losing venture by a series of misrepresentations, such as that Amway had done extensive research before offering the service, that the service would be the "best" in the nation, that any business telephone line could be used with the TeleCharge phone, that the service had been approved in all 50 states and did not require the approval of any telephone company, that each phone could be expected to

generate an annual revenue for the distributor of $750, that the carrier that Amway had retained to handle the calls and billings for the TeleCharge phones (International Tele–Charge, Inc. (ITI)) was the largest company of its kind in the nation, and that the purchaser of a TeleCharge phone would have to deal with ITI—the phone could not be reprogrammed to work with any other carrier.

The district court threw out All–Tech's claims of misrepresentation on the basis of the "economic loss" doctrine of the common law. Originally this doctrine was merely a limitation on who could bring a tort suit for the consequences of a personal injury or damage to property: only the injured person himself, or the owner of the damaged property himself, and not also persons having commercial links to the owner, such as employees or suppliers of a merchant whose store was burned down as a result of the negligence of a third party, the tort defendant. *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 573 N.W.2d 842 (1998); *Northridge Co. v. W.R. Grace & Co.*, 162 Wis.2d 918, 471 N.W.2d 179, 181–86 (1991); *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis.2d 910, 437 N.W.2d 213 (1989); *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997); *Miller v. U.S. Steel Corp.*, 902 F.2d 573 (7th Cir.1990) (applying Wisconsin law); *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24 (7th Cir.1989); *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (Traynor, J.). Since damage to property and even to person is a real cost and hence "economic," the doctrine would be better named the "commercial loss" doctrine. *Miller v. U.S. Steel Corp.*, supra, 902 F.2d at 574.

One explanation for it is that a tort may have indirect consequences that are beneficial—in the example just given, to competitors of the burned-down store—as well as harmful, and since the tortfeasor is not entitled to sue for the benefits, neither should he have to pay for the losses. *CSY Liquidating Corp. v. Harris*

*Trust & Savings Bank*, 162 F.3d 929, 933 (7th Cir.1998); *Rardin v. T & D Machine Handling, Inc.*, supra, 890 F.2d at 29. Another and less esoteric explanation is the desirability of confining remedies for contract-type losses to contract law. Suppliers injured in their pocketbook because of a fire at the shop of a retailer who buys and distributes their goods sustain the kind of purely business loss familiarly encountered in contract law, rather than the physical harm, whether to person or to property, with which tort law is centrally concerned. These suppliers can protect themselves from the loss caused them by the fire by buying business-loss insurance, by charging a higher price, or by including in their contract with the retailer a requirement that he buy a minimum quantity of goods from the supplier, regardless. The suppliers thus don't need a tort remedy. *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, supra, 573 N.W.2d at 847–49.

This point has implications for commercial fraud as well as for business losses that are secondary to physical harms to person or property. Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation. The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law. That law has been shaped by a tension between a policy of making the jury the normal body for resolving factual disputes and the desire of parties to contracts to be able to rely on the written word and not be exposed to the unpredictable reactions of lay factfinders to witnesses who testify that the contract means something different from what it says. Many doctrines of contract law, such as the parol evidence and "four cor-

ners" rules, are designed to limit the scope of jury trial of contract disputes (another example is the statute of frauds). Tort law does not have these screens against the vagaries of the jury. In recognition of this omission, the "economic loss" doctrine in the form invoked by the district judge in this case on the authority of a growing body of case law illustrated by *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co.*, 123 F.3d 675, 682 (7th Cir.1997) (applying Wisconsin law); *Badger Pharmacal, Inc. v. Colgate–Palmolive Co.*, 1 F.3d 621, 628 (7th Cir. 1993) (ditto); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1234–35 (Wyo. 1996); *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 107–08 (Iowa 1995), and *AKA Distributing Co. v. Whirlpool Corp.*, 137 F.3d 1083 (8th Cir.1998), forbids commercial contracting parties (as distinct from consumers, and other individuals not engaged in business) to escalate their contract dispute into a charge of tortious misrepresentation if they could easily have protected themselves from the misrepresentation of which they now complain. The principle is well illustrated by *Tatge v. Chambers & Owen, Inc.*, 219 Wis.2d 99, 579 N.W.2d 217, 220–21 (1998), a suit by a former employee claiming that the employer had misrepresented the employment contract to be terminable only for cause, rather than at will. The bearing of those representations could be fully considered in a suit for breach of contract.

The function of the economic-loss doctrine in confining contract parties to their contractual remedies is particularly well illustrated by cases involving product warranties, such as our *Cooper Power Systems* case. See also *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612, 618 (1992). If the seller makes an oral representation that is important to the buyer, the latter has only to insist that the seller embody that representation in a written warranty. The warranty will protect the buyer, who will have an adequate remedy under the Uniform Commercial Code if the seller reneges. To allow him to use tort law in effect to enforce an oral warranty would unsettle contracts by exposing sellers to the risk of being held liable by a jury on the basis of self-interested oral testimony and perhaps made to pay punitive as well as compensatory damages. This menace is averted by channeling disputes into warranty (contract) law, where oral warranties can be expressly disclaimed, or extinguished by operation of the parol evidence rule. UCC §§ 2–202, 2–316(1) and comment 2; 1 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 12–4 (3d ed. 1988). It is true that, in principle, the cheapest way to prevent fraud is to punish the fraudfeasor; but in practice, owing to the ever-present possibility of legal error, the really cheapest way in some cases may be to place a burden of taking precautions on the potential victim. Cf. Alon Harel, "Efficiency and Fairness in Criminal Law: The Case for a Criminal Law Principle of Comparative Fault," 82 *Calif. L. Rev.* 1181 (1994).

█ Some of our cases describe the economic-loss doctrine in words that might seem to imply the abolition of the tort of misrepresentation (including deliberate fraud) in all cases in which the plaintiff and the defendant are business firms having a preexisting contractual relationship that had given rise to the fraud or other misrepresentation. E.g., *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1300–01 (7th Cir.1991). But it is a disservice to courts, as well as a common source of erroneous predictions concerning the scope and direction of the law, to treat a judicial opinion as if it were a statute, every clause of which was Law. It is difficult to write a judicial opinion without making some general statements by way of background and explanation. But in a system of case law such statements can be misleading if carelessly lifted from the case–specific contexts in which they were originally uttered. That is why courts in assessing the binding effect of previous

decisions distinguish between the dicta, which are the inessential parts of the opinion, and the holding.

If commercial fraud is to go completely by the boards, as a literal reading of some of the economic-loss cases might suggest, then prospective parties to contracts will be able to obtain legal protection against fraud only by insisting that the other party to the contract reduce all representations to writing, and so there will be additional contractual negotiations, contracts will be longer, and, in short, transaction costs will be higher. And the additional costs will be incurred in the making of *every* commercial contract, not just the tiny fraction that end up in litigation. Granted, there are costs of uncertainty from the possibility of falsely charging fraud when a contractual relationship sours, as it did in this case. But the fraud tort comes with safeguards against false claims, such as the requirement of pleading fraud with particularity and (in many though not all jurisdictions) a heightened burden of proof—clear and convincing evidence versus a bare preponderance of the evidence, the standard civil burden. *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 468–71 (7th Cir.1999).

■ But the representations challenged in this case do not press against the boundaries of the economic-loss doctrine. For they are in the nature of warranties (remember that the plaintiff made warranty claims, which the judge sent to the jury), and we cannot think of a reason why the fact that the "product" warranted was a hybrid of a product and a service should affect the application of the doctrine. A genuine stumbling block to affirming on its basis, however, is the fact that its application to cases of *intentional* misrepresentation is uncertain. *Daanen & Janssen, Inc. v. Cedarapids, Inc., supra*, 573 N.W.2d at 851, ducks the issue, and we haven't a clue as to how Wisconsin will resolve it. Other jurisdictions have divided over it, Reeder R. Fox & Patrick J. Loftus, "Riding the Choppy Waters of East River: Economic

Loss Doctrine Ten Years Later," 64 *Defense Counsel J.* 260, 268–70 (1997), and the balance of the competing considerations is, as we have suggested, close. We need not choose. Amway has a solid alternative ground for affirmance: All–Tech failed to present any evidence of actionable misrepresentation. Some of the alleged misrepresentations were corrected before All–Tech bought its first TeleCharge phone, such as the misrepresentations that the phone could be installed on any business line and that regulatory approval of the service had been obtained in all 50 states. The victim of a misrepresentation about a product who learns the truth before he buys, but decides to buy the product anyway, cannot complain about the misrepresentation. *First Credit Corp. v. Behrend*, 45 Wis.2d 243, 172 N.W.2d 668, 671–72 (1969); *Foss v. Madison Twentieth Century Theaters, Inc.*, 203 Wis.2d 210, 551 N.W.2d 862, 865–66 (1996). Whatever he has relied on, it is not that.

■ Some of the representations were made not by Amway but by one of its distributors, at a trade meeting attended by All–Tech's principals. Amway distributors are independent contractors, *Amway Corp., Inc. v. Director of Revenue*, 794 S.W.2d 666, 670–71 (Mo.1990); *Lomax v. Henry*, 119 A.D.2d 638, 501 N.Y.S.2d 84 (1986) (per curiam), rather than employees whose representations might bind their employer by force of the doctrine of respondeat superior. The distributor in question was describing his own experience in selling TeleCharge phones, and there is no evidence that he was speaking with Amway's actual or apparent authority or that Amway ratified and by ratifying adopted his remarks. In these circumstances, Amway was not legally responsible for them. *Iowa National Mutual Ins. Co. v. Backens*, 51 Wis.2d 26, 186 N.W.2d 196 (1971); *Wojciuk v. United States Rubber Co.*, 19 Wis.2d 224, 120 N.W.2d 47, 53 (1963); *Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir.1993) (applying Wisconsin law). An agent "cannot just

bootstrap himself into a position where he can bind his principal." *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 568–69 (7th Cir.1984). It would be absurd to hold a supplier to every representation made by distributors or dealers in its products— distributors or dealers who in the case of some suppliers, such as Amway, number in the thousands.

◼ Many of Amway's alleged misrepresentations were either pure puffing (such as TeleCharge is "the best")—which is to say, empty superlatives on which no reasonable person would rely, *State v. American TV & Appliance of Madison, Inc.*, 146 Wis.2d 292, 430 N.W.2d 709, 712 (1988); *Alropa Corp. v. Flatley*, 226 Wis. 561, 277 N.W. 108 (1938); *Loula v. Snap–On Tools Corp.*, 175 Wis.2d 50, 498 N.W.2d 866 (1993); see also UCC § 2–313(2)—or meaningless sales patter, such as that Amway had put the same effort into developing this product as it did with its other products. Amway sells a vast array of products, and obviously doesn't expend the same absolute or proportional amount of money on the development of each one; no one could believe such a thing, as pointed out in *Loula*, a case factually similar to ours. "There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity." *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir.1918) (L. Hand, J.). All–Tech doesn't claim to be run by the sort of naifs who got suckered into raising Chinchillas in the 1950s.

The TeleCharge service was new, and like many new services it ran into unexpected, and ultimately fatal, problems. As these problems surfaced, Amway would notify its distributors, including All–Tech. Despite a barrage of bad news, All–Tech continued buying TeleCharge phones. It could not have been relying on the alleged misrepresentations. All of them had either been corrected before All–Tech bought the phones or would not have misled a commercial purchaser. Or were not material, such as ITI's size—whether or not it was the largest company of its kind, the kind the parties call "alternative operator service," it was not a fly-by-night outfit incapable of providing the service for which Amway had contracted with it. Or were hypothetical: "If you charge the one dollar maximum access fee, with an average of only three billable long-distance calls a day, five days per week, 50 weeks per year, you may generate up to $750 a year from just one phone"—impeccable arithmetic, given the premises, which Amway did not warrant. Or were predictions that either were too vague to ground reasonable reliance or were not falsified. Or were not made at all, such as the representation that the phone could not be reprogrammed to work with another operator service besides ITI. There were, in short, no actionable misrepresentations.

◼ All–Tech's alternative claim is promissory estoppel. The doctrine of promissory estoppel provides an alternative basis to consideration for treating a promise as a contractual undertaking. When applicable, which to say when the promise is definite enough to induce a reasonable person to rely, *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965); *Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir.1998) (applying Wisconsin law); *State Bank of Standish v. Curry*, 442 Mich. 76, 500 N.W.2d 104, 108 (1993) ("the sine qua non of the theory of promissory estoppel is that the promise be clear and definite"); *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn.1995); E. Allen Farnsworth, *Contracts* § 2.19, p. 95 (3d ed.1999), the doctrine makes the promise enforceable.

◼ Promises are usually forward-looking; one promises to do something, necessarily in the future. The promise that All–Tech stresses as the basis for its claim of promissory estoppel—that Amway had thoroughly researched the TeleCharge program before offering it to distributors—is not of that character. It warrants

a past or existing condition rather than committing to some future action and is thus more precisely described as a warranty than as a promise. UCC § 2–313(1)(a); *Restatement (Second) of Contracts* § 2 comment d (1981); *Ewers v. Eisenzopf*, 88 Wis.2d 482, 276 N.W.2d 802 (1979); *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561, 570 (7th Cir. 1993). But a warranty is a type of promise—in this case a promise by Amway to pay for the consequences should the research that went into the development of TeleCharge not have been thorough after all. *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir.1946) (L. Hand, J.) (a warranty "amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past"); *Restatement of Contracts* § 2 (1932); cf. Oliver Wendell Holmes, Jr., *The Common Law* 298–301 (1881).

█ Since a warranty can induce reasonable reliance, its breach can be the basis for a claim of promissory estoppel. *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir.1996); *Irvin v. Lowe's of Gainesville, Inc.*, 165 Ga.App. 828, 302 S.E.2d 734 (1983); *Garcia v. Von Micsky*, 602 F.2d 51, 54 (2d Cir.1979) (dissenting opinion). But only in limited circumstances. A promisee cannot be permitted to use the doctrine to do an end run around the rule that puffing is not actionable as misrepresentation, or around the parol evidence rule. *Davis v. University of Montevallo*, 638 So.2d 754, 758 (Ala. 1994); *Big G Corp. v. Henry*, 148 Vt. 589, 536 A.2d 559, 562 (1987); *Johnson v. Curran*, 633 P.2d 994, 996–97 (Alaska 1981); *Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 207 Ill.Dec. 690, 648 N.E.2d 146, 152–53 (1995) (collecting cases); *Durkee v. Goodyear Tire & Rubber Co.*, 676 F.Supp. 189, 191–92 (W.D.Wis. 1987) (predicting Wisconsin law); cf. *Goldstick v. ICM Realty*, 788 F.2d 456, 465–66 (7th Cir.1986) (statute of frauds); but see *Prudential Ins. Co. v. Clark*, 456 F.2d 932, 937 (5th Cir.1972). That rule is as applicable to a suit on an oral warranty as to a suit on any other oral promise. The Uniform Commercial Code is explicit about this. UCC § 2–316(1) and comment 2; see also *Bushendorf v. Freightliner Corp., supra*, 13 F.3d at 1027; *Thacker v. Menard, Inc.*, 105 F.3d 382, 385 (7th Cir. 1997); 1 White & Summers, *supra*, § 12–4.

█ The objections to All–Tech's claim of promissory estoppel are related to our earlier point that the economic-loss doctrine serves to protect contract doctrines and to prevent the piling on of duplicative remedies. Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill. *Spensley Feeds, Inc. v. Livingston Feed & Lumber, Inc.*, 128 Wis.2d 279, 381 N.W.2d 601, 607 n. 8 (1985); *Frost Construction Co. v. Lobo, Inc.*, 951 P.2d 390, 397 (Wyo.1998); *Tuomala v. Regent University*, 252 Va. 368, 477 S.E.2d 501, 506 (1996); *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1333 (7th Cir.1995); *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir.1990); compare *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis.2d 417, 321 N.W.2d 293 (1982). To allow it to be invoked becomes in those circumstances gratuitous duplication or, worse, circumvention of carefully designed rules of contract law. In our case the parties had a contract covering the relationship in the course and within the scope of which the alleged warranty of thorough research was made. This either was one of the warranties of the contract or it was not (by virtue of disclaimer, the puffing exemption, or the parol evidence rule). If it was not (and it was not), we cannot think of any reason for using the doctrine of promissory estoppel to resuscitate it. "Promissory estoppel is

not a doctrine designed to give a party . . . a second bite at the apple in the event it fails to prove a breach of contract." *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir.1984).

AFFIRMED.