# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1133

CLIFF DUMAS,

*Plaintiff-Appellant,*

v.

INFINITY BROADCASTING
CORPORATION and WUSN-FM,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 4713—**James F. Holderman**, *Judge.*

———————

ARGUED SEPTEMBER 15, 2004—DECIDED AUGUST 1, 2005

———————

Before FLAUM, *Chief Judge*, and COFFEY and KANNE,
*Circuit Judges*.

COFFEY, *Circuit Judge*.  On July 7, 2003, Cliff Dumas, a
country music radio personality, filed a diversity action in
the United States District Court for the District of
New Mexico against Infinity Broadcasting Corporation
("Infinity") and its Chicago affiliate, WUSN-FM ("US-99").
In his complaint, Dumas alleged that he was entitled to
monetary damages for breach of contract and promissory

estoppel arising out of an unfulfilled employment agreement with US-99. Shortly after the complaint was filed, the case was transferred on Infinity's motion to the United States District Court for the Northern District of Illinois. Following discovery, the defendants moved for summary judgment pursuant to FED. R. CIV. P. 56. The district court agreed and granted the defendants' motion, finding that Dumas' claim for breach of contract was barred by the Illinois statute of frauds and, as a result, his promissory estoppel claim was untenable. We affirm.

## I. BACKGROUND

Although country music is most often thought of in terms of geographical locales such as Nashville, Tennessee and Dallas, Texas, it seems that Canadians enjoy entertainers such as Anne Murray, Patsy Cline and Johnny Cash just as much as their American counterparts. Living proof of this phenomenon is Cliff Dumas, a country music radio broadcaster with an excess of 24 years of experience, most of it in places such as Calgary and Toronto in Canada. Throughout his career, Dumas has hosted a number of successful radio programs, an example of which is the syndicated "Canadian Country Countdown," which was broadcast throughout Canada. Indeed, in 1990 Dumas was honored by the Country Music Association and presented with the "Medium Market Broadcast Personality of the Year," the first time such an award was given to a radio host outside the United States.

Beginning in 2000, Dumas attempted to leverage his accomplishments in Canadian radio and began soliciting employment in the United States market. At some point, toward the end of April of that year, he was contacted by Scott Aurand (a.k.a. Justin Case), the program director of a country music radio station in Chicago, US-99. Aurand

expressed an interest in flying Dumas and his wife to meet with himself and other US-99 executives regarding possible employment opportunities. Dumas accepted Aurand's offer, and while in Chicago spoke with Aurand and the US-99's general manager, Steve Ennen, concerning a possible opening for Dumas as host of the US-99 morning show. At this point it became evident that although Dumas was negotiating directly with Aurand, it was Ennen and others in management positions at the station and Infinity that would have the final decision-making authority as to his hiring. Upon his return to Canada, Dumas was informed by Aurand via e-mail that based on his salary and bonus requests, as well as job expectations, Ennen "would not present [the proposal] to corporate", meaning the deal was effectively dead.[1] With the two parties far apart from a

---

[1] In an e-mail dated May 3, 2000, Aurand outlined that the offer that the station was willing to give Dumas was a five-year deal with $150,000 for the first year and a $10,000 raise the following four years. Also, the station was willing to guarantee bonuses commensurate to performance starting at $10,000 for a fifth place ranking in the ratings for the morning time slot and an additional $10,000 for each step up in the ratings, with $40,000 for a first place ranking. However, apparently Dumas was seeking "a salary of 200 thousand [sic] plus," with "a 100 thousand [sic] signing bonus and 250 thousand dollar [sic] buy out [sic] plus a 100 thousand [sic] completion of contract bonus." Dumas also stated that while "[a] signing bonus would be great . . . I feel a buy out [sic] is an absolute must."

Aurand responded to Dumas' counteroffer by stating that he would "take it to Steve [Ennen]," but cautioned that in his opinion they were "a long way away." As noted above, Ennen refused to present the deal to the station's owners at Infinity. Indeed, Aurand informed Dumas that Infinity "works differently" and that the numbers Dumas was asking for might be appropriate for "a
(continued...)

compromise on monetary and other issues[2] concerning the employment opportunity, negotiations broke down without Infinity ever making an official job offer and Dumas began pursuing other opportunities.

Shortly thereafter, Dumas was contacted by Citadel Communications Corporation, another broadcasting company, about hosting a morning show on a station they owned in Albuquerque, New Mexico. An interview was arranged and a few days later Dumas accepted the position, officially taking over the morning program at KRST and moving his family to New Mexico at the end of May 2000.

Approximately a year and a half passed without any further negotiation or contact between Dumas and the management of US-99. This changed in December of 2001, however, when Dumas and Aurand began communicating once again. Initially, the conversations between the two were friendly interactions about how each party was faring as well as about a small debt that Dumas owed Aurand during his Chicago visit in 2000. However, beginning in February of 2002, the two men once again began discussing the possibility of Dumas hosting a radio program at US-99.

In a series of e-mails exchanged between Dumas and Aurand beginning on or about February 22, 2002, Dumas related his intention to leave his job at KRST (Albuquerque) and informed him that he had sold his house in order that he might be ready to move when "the right opportunity" presented itself. Aurand responded by telling Dumas that he should keep in touch.

---

[1] (...continued)
second contract if [he] were wildly successful," but not as an initial offering. In other words, it seems Dumas was overshooting the target.

[2] Dumas stated that he "kind of felt that" if he were to accept employment at US-99 he would be "jumping into a sinking ship." Dumas Depo. at 56.

Allegedly, over the next month-and-a-half, a number of phone calls ensued between the two, culminating in an April 8, 2002 e-mail in which Aurand asked Dumas to identify what salary range he would consider accepting for an opportunity to host the morning show at US-99,[3] with the choices ranging from $125,000 to $250,000. Dumas replied that "something in the 175 to 225 range seems right."

Aurand replied with an e-mail dated April 29, 2002 wherein he informed Dumas that "[i]t is important that we start talking 'real' opportunity . . . [t]here may be 'real' opportunity [at the station for you] . . . I'm going to need a regular influx of tape."[4] In addition, the e-mail sets out numerous other talking points that need to be discussed, such as: (a) whether or not Dumas' personality and radio demeanor would fit in at the station; (b) who would join him, if anyone, on the air; (c) whether Dumas intended to stay with the station for an extended period of time; (d) whether Dumas could work effectively as a leader; and (e) whether Dumas and US-99 could compromise on the issue

---

[3] The full text of the e-mail, with the subject line "what are we looking at" reads:

> Cliff,
>
> So give me an idea of where you're [sic] heads [sic] at.
>
> 1. 125 to 175
>
> 2. 175 to 225
>
> 3. 225 to 250
>
> 4. not going to happen.
>
> Justin Case

[4] When Aurand asks Dumas for a "regular influx of tape" he is asking that Dumas send him tape recordings of his show at KRST so that Aurand and US-99 management can get a feel for his personality and the manner in which he conducts himself on the air.

of salary.[5] Dumas claims that, following this e-mail, he and Aurand had a number of subsequent telephone conversations regarding the philosophy (i.e., the age, gender and income bracket of the targeted audience) of the proposed morning show, the time frame of Dumas' potential employment as well as the financial terms of the potential agreement. Indeed, Dumas alleges that all the components of a contract were in place such as salary ($175,000 to start), start date (August 4, 2002) and contract length (5 years with an option for 5 more) and that the contract was orally consummated via telephone on May 20, 2002.

On May 20, Aurand informed Dumas via e-mail that, because the morning show at US-99 had dropped to 16th in the most recent ratings, the station was "moving forward with [their] plans to bring [him] in." Aurand outlined a formula for the morning show and informed Dumas in plain terms that his goal was to move the show up in the ratings. With the help of the right new morning host, Aurand believed he would be able to move the show from where it presently was in the ratings to the top 8 among all radio formats in the Chicago market.[6]

---

[5] As to the money issue, Aurand writes in the April 29 e-mail that: "I think we can compromise here. There may be a window. You need to be willing to prove yourself to some extent . . . and we need to be able to pay a little more than we are comfortable with. If you can get us into scoring position . . . we can all make a little dough."

[6] In pertinent part the e-mail states: "Trend [*i.e.*, ratings] came out today-down-morning show 16th 25-54. This is not acceptable. We are moving forward with our plans to bring you in. Here is our formula for the AM show. How does this strike you. We will likely reduce it to TWO players—CLIFF & TRISH. (no producer at beginning) [with the format being] 1) Warm & Friendly [sic] 2) Music Focused (at start) [sic] 3) Brief & Topical [sic] 4) positive

(continued...)

Despite Aurand's enthusiasm for Dumas in late May, the record reflects that Dumas was having a problem obtaining the necessary release before negotiating with any interested parties from KRST.[7] Indeed, on June 4, 2002, Aurand advised Dumas in writing that: "We can't do anything without a release . . . [v]erbal does not count for our legal team . . . [b]est of luck securing the paper work." Dumas responded by writing that he was "just waiting for the . . . paper work" from management and informed Aurand that he had advised KRST that June 21, 2002 would be his last day at that station. Apparently Aurand was surprised at this turn of events and wrote back the next day stating: "You are leaving—as in done? Do you have the option of staying? You said you were just getting a waiver to look at opportunities. Hope you did not burn a bridge." Shortly thereafter Dumas did obtain a written release from his contract on June 6, 2002, which he in turn forwarded to Aurand, and tendered his resignation to KRST effective June 24, 2002. Dumas claims that shortly after receiving the June 4 e-mail he contacted Aurand on the telephone and was assured that once Infinity's lawyers received the written release document Dumas' employment would be assured, but admits that Aurand also told him that he should contact Eric Logan (Aurand's supervisor), who had recently been hired as the operations manager at US-99 and would have to "sign off" on the hiring of Dumas.

On June 13, 2002, Dumas took Aurand's advice and sent an e-mail to Logan introducing himself and stating that he looked "forward to talking . . . about what [he could] bring

---

[6]  (...continued)
[sic] a) Love the city [sic] b) Love the listener [sic] c) Love the music [sic] The goal for the show is to be in the (TOP 8) 25-54 all formats."

[7]  The parent company of US-99, Infinity, required a release from KRST before carrying on any further negotiations with Dumas.

to the station and the company." In the same e-mail, Dumas informed Logan that he had been released from his contract "to pursue this opportunity," and reminded Logan of the "discussions [he and Aurand] had about taking over the morning show in August." The remainder of the e-mail to Logan contains a protracted recitation of Dumas' qualifications for the morning host position and closes with a reference to the fact that Aurand was aware of his merits as a performer including the tapes that he had previously forwarded to Aurand up to that "point in the negotiations." Although Logan was in transit at the time, he set up an appointment to talk with Dumas in the near future. The two eventually did talk and Dumas recalls being reassured that "everything was moving forward."

Over the next few weeks Dumas continued to send Logan e-mails espousing his qualifications in an attempt to convince Logan that he was the right person for the job. For example, on June 28, 2002, Dumas sent Logan a follow-up e-mail with a list of references for him to peruse while "considering [his] options." Then, on July 12, 2002, Dumas' tone turned a bit more anxious and he pleaded with Logan to tell him whether the "pending deal was going to fly," while letting him know that he had waited "for close to a month for a decision to be made." Nonetheless, Dumas made clear that he had "a couple of other opportunities in Toronto, opportunities I want to take." The situation became considerably more tempestuous on July 23, however, when Dumas challenged Logan to "come up with a financial arrangement to help me out of this mess we've got ourselves into," and offered that his "lawyer [had] copies of everything." At this point US-99 executives stopped returning Dumas' phone calls and e-mails, and Dumas became aware that his chances of being employed with the company had been eclipsed.

On July 7, 2003, Dumas brought suit against US-99's parent corporation, Infinity, claiming that he was entitled

to damages for breach of contract and promissory estoppel based on his dealings with US-99. Although the legal action was originally filed in the United States District Court for the District of New Mexico, the case was subsequently transferred for trial to the Northern District of Illinois and, after discovery, Infinity moved for summary judgment. The district court granted Infinity's motion, finding that both of Dumas' claims were controlled by Illinois law. Furthermore, the court found that both of Dumas' claims failed as a matter of law because of his failure to produce sufficient documentary evidence establishing the existence of a written contract or agreement, as required by the Illinois statute of frauds, between himself and Infinity. We affirm.

## II. DISCUSSION

We review a district court's grant of summary judgment de novo, and will view all the facts and draw all reasonable inferences therefrom in favor of the non-movant, Dumas. *Hardy v. Univ. of Ill. at Chicago*, 328 F.3d 361, 364 (7th Cir. 2003); *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1228 (7th Cir. 1995). Summary judgment is proper only in cases where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002).

On appeal Dumas does not challenge the district court's finding that Illinois law controls nor does he challenge the court's determination that his breach of contract claim is barred by the Illinois statute of frauds, which requires that any "promise or agreement" that cannot be performed within one year be documented in writing. Accordingly, the only issue we are presented with on appeal is whether, as a matter of law, Dumas has presented sufficient evidence to establish a viable claim for promissory estoppel and what, if any, application the statute of frauds has upon this claim.

Dumas presents this court with what can only be classified as a most confusing and convoluted argument. At the outset, Dumas admits that he has no quarrel with the district court's determination that his breach of contract claim is barred by Illinois' statute of frauds because any alleged contract between US-99 and himself could not be established with the paucity of written evidence (e-mails) presented to the district court. *See* 740 ILCS 80/1. Also, Dumas readily concedes, as he must, that "his promissory estoppel claim is [also] within the [scope of the] Illinois statute of frauds." Appellant's Brief at 15; *see Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 284 (7th Cir. 1999) ("Under Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel."); *McInerney v. Charter Golf, Inc.*, 176 Ill.2d 482, 492, 223 Ill.Dec. 911, 916, 680 N.E.2d 1347, 1352 (Ill. 1997).[8] Nonetheless, Dumas claims that he can prevail, as a matter of law, on his promissory estoppel claim by employing documentary evidence, which he concedes falls short of satisfying the Illinois statute of frauds for contract purposes, to establish that Infinity made an unambiguous promise to employ him under a promissory estoppel theory.

---

[8] It should be noted that under Illinois law a claim for *equitable* estoppel, unlike promissory estoppel, is not subject to the requirements of the statute of frauds. *See Dickens v. Quincy College Corp.*, 245 Ill.App.3d 1055, 1062, 185 Ill.Dec. 822, 826, 615 N.E.2d 381, 385 (Ill. App. Ct. 1993) (citing *Cohn v. Checker Motors Corp.*, 233 Ill.App.3d 839, 845-46 (Ill. App. Ct. 1992)), *accord Ozier v. Haines*, 411 Ill. 160, 165, 103 N.E.2d 485, 488 (Ill. 1952). However, at no point in the proceedings either in this court or in the trial court did Dumas advance a claim based on equitable estoppel grounds. Thus, we will not consider whether the outcome of this case would be altered by the introduction of a claim for equitable estoppel.

The Illinois Supreme Court has delineated a four-part test to determine whether a claim premised on promissory estoppel grounds may succeed, which requires a plaintiff to prove that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 309-10, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (Ill. 1990) (quoting *Yardley v. Yardley*, 137 Ill.App.3d 747, 754, 92 Ill.Dec. 142, 484 N.E.2d 873 (Ill. App. Ct. 1985)); *see Bank of Marion v. Robert "Chick" Fritz, Inc.*, 57 Ill.2d 120, 124, 311 N.E.2d 138, 140 (Ill. 1974). As we have noted in the past, however, "[p]romissory estoppel is not a doctrine designed to give a party . . . a second bite at the apple in the event that it fails to prove a breach of contract." *See All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869-70 (7th Cir. 1999) (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)). Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking. *See Bank of Marion*, 57 Ill.2d at 124. In such an instance "[a]lthough there may be absent a bargained-for consideration, a person who makes a promise may nonetheless be bound by its terms." *Id.*; *see Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 695, 648 N.E.2d 146, 151 (Ill. App. Ct. 1995); *People v. Raymond*, 202 Ill.App.3d 704, 708, 147 Ill.Dec. 878, 881, 560 N.E.2d 26, 29 (Ill. App. Ct. 1990); *Moore v. Illinois Bell Telephone Co.*, 155 Ill.App.3d 781, 785-86, 108 Ill.Dec. 358, 360, 508 N.E.2d 519, 521 (Ill. App. Ct. 1987). This is consistent with the history of the doctrine of promissory estoppel, that it is a common law equitable device wherein a contract may be implied where none is found to exist, i.e., for lack of consideration. *See Dickens*, 245 Ill.App.3d at 1062. Thus, the doctrine of promissory estoppel is applicable only under certain narrow circumstances to serve "as substitute for

consideration or an exception to its ordinary requirement."
*Bank of Marion*, 57 Ill.2d at 124. It necessarily follows that
where there is "no issue of consideration, there is no gap in
the remedial system for promissory estoppel to fill." *All-
Tech Telecom, Inc.*, 174 F.3d at 869; *see also Destron, Inc. v.
Continental Illinois National Bank & Trust Co.*, 59 B.R.
240, 245 (Bankr. N.D. Ill. 1986) ("Promissory estoppel does
not establish a contract, but is merely a substitute for
consideration.").

Also, the Illinois statue of frauds—which Dumas agrees
is applicable—precludes the enforcement of any *promise to
employ* that cannot be performed within one calender year
"unless the promise or agreement upon which such action
shall be brought, or some memorandum or note thereof,
shall be in writing, and signed by the party to be charged
therewith, or some other person thereunto by him lawfully
authorized." 740 ILCS 80/1. The statute of frauds' writing
requirement "is not [intended] to enable parties 'to repudi-
ate contracts that have in fact been made; it is only to pre-
vent the fraudulent enforcement of asserted contracts that
were not made.'" *Rose v. Mavrakis*, 343 Ill.App.3d 1086,
1097, 278 Ill.Dec. 751, 760, 799 N.E.2d 469, 478 (Ill. App.
Ct. 2003) (quoting *Haas v. Cravatta*, 71 Ill.App.3d 325, 328-
29, 27 Ill.Dec. 414, 389 N.E.2d 226 (Ill. App. Ct. 1979)).
Thus, in order to succeed on his claim of promissory
estoppel, Dumas must—as a threshold matter—present to
the court written evidence of an "unambiguous promise"
which, but for the existence of bargained-for consideration,
would constitute an enforceable contractual agreement
under Illinois law—something which he has failed to accom-
plish.

In the ordinary course of litigation of this nature it is
commonplace for the plaintiff, after having been unsuccess-
ful in producing written documentation of an alleged oral
contract as required by the statute of frauds, to seek to
recover under the alternate theory of promissory estoppel.
*See McInerney*, 176 Ill.2d at 492. In such a case, since the

statute of frauds applies with equal force under either a breach of contract or promissory estoppel theory under Illinois law, it is unnecessary for the courts to undertake a separate promissory estoppel analysis, for the statute of frauds *per se* cannot be satisfied. *See Fischer*, 195 F.3d at 283-84. The only substantive difference between that scenario and the situation before us, is Dumas' additional claim that, although the documents he submitted to the district court (admittedly) failed to satisfy the elements of an enforceable contract, they might conceivably constitute an unambiguous promise to employ. We agree with the reasoning employed by the district court and are of the opinion that it is unnecessary for a court, once satisfied that the statute of frauds could not be satisfied concerning a breach of contract claim, to undertake a separate analysis of whether or not an "unambiguous promise" exists for promissory estoppel purposes, for the outcome would be the same in either instance.

The district court properly determined, and Dumas agrees, that the documentary evidence he presented in the form of e-mails falls short of establishing the essential elements of a contract, *e.g.*, offer, acceptance and a meeting of the minds. Thus, the Illinois statute of frauds' requirement that documentary evidence of a "promise or agreement" be produced could not be satisfied. *See* 740 ILCS 80/1. The absence of the essential elements of a contract also effectively foreclosed any legitimate promissory estoppel argument that he may have had, for as we have explained, Illinois law requires that, but for consideration, all other elements of a contractual agreement exist in conjunction with such a claim. *See Bank of Marion*, 57 Ill.2d at 124; *Prentice*, 271 Ill.App.3d at 512; *Raymond*, 202 Ill.App.3d at 708; *Moore*, 155 Ill.App.3d at 785-86.[9] In addition, by failing to establish

---

[9] Also, it should be noted that although a lack of consideration is the only reason that courts generally will award damages on the

(continued...)

a valid agreement or promise sufficient to satisfy the
statute of frauds while proceeding under a breach of con-
tract theory, he likewise, on the record before us, has been
unsuccessful in establishing a promise—much less an
"unambiguous" promise—under the doctrine of promissory
estoppel. *See Moore*, 155 Ill.App.3d at 785-86. It is only logi-
cal to conclude that, where a plaintiff is unable to establish
a written "promise or agreement" sufficient to satisfy the
statute of frauds under the traditional requirements of
contract law, he will also *per se* be unable to demonstrate
the existence of an "unambiguous promise" for promissory
estoppel purposes, for the promissory estoppel standard is
more rigorous. *Quake Constr., Inc.*, 141 Ill.2d at 309-10; *see*

---

[9] (...continued)
basis of promissory estoppel, Dumas has not alleged that con-
sideration was lacking. Under Illinois law, "[c]onsideration con-
sists of some detriment to the offeror, some benefit to the offeree,
or some bargained-for exchange between them." *Doyle v. Holy
Cross Hosp.*, 186 Ill.2d 104, 112, 237 Ill.Dec. 100, 105, 708 N.E.2d
1140, 1145 (Ill. 1999) (citing *Lipkin v. Koren*, 392 Ill. 400, 406, 64
N.E.2d 890 (Ill. 1946)). And, "[a]ny act or promise which is of
benefit to one party or disadvantage to the other is a sufficient
consideration to support a contract." *Id.* (quoting *Steinberg v.
Chicago Medical School*, 69 Ill.2d 320, 330, 13 Ill.Dec. 699, 371
N.E.2d 634 (Ill. 1977)). Indeed, the contract that Dumas alleged
did encompass a "bargained-for" exchange in that Dumas claimed
that he would be paid certain amounts of money ($175,000 to
start) for hosting the morning show at US-99 over a five-year
period, with the mutual option to continue his employment for
another five years. *See supra* p. 6. The fact that consideration
likely existed effectively extinguished any promissory estoppel
claim that Dumas may have had. *See Bank of Marion*, 57 Ill.2d at
124; *All-Tech Telecom, Inc.*, 174 F.3d at 869; *Destron, Inc.*, 59 B.R.
at 245. As this court has noted, to allow the doctrine of promissory
estoppel to be invoked where consideration exists, "becomes a
gratuitous duplication or, worse, circumvention of carefully
designed rules of contract law." *All-Tech Telecom, Inc.*, 174 F.3d
at 869.

*also Phillips v. Britton*, 162 Ill.App.3d 774, 785-86, 114 Ill.Dec. 537, 545, 516 N.E.2d 692, 700 (Ill. App. Ct. 1987) (holding that "[t]he promise which the Phillipses contend to have made in this case, however, is the same as the agreement underlying their claim for breach of contract, and the evidence adduced by them with respect to each is identical . . . [and] just as we believe that the trial court could have found that the terms of the agreement were not clear, definite and unequivocal, we therefore likewise believe that it could have determined that the promise was not unambiguous"). Thus, we are of the opinion that the district court properly granted Infinity's motion for "summary judgment on Dumas's promissory estoppel claim because [such a] claim is not available to avoid the statute of frauds." *Dumas v. Infinity Broadcasting, Corp.*, No. 03-C-4713, 2003 WL 23509644, at *10 (N.D. Ill. Dec. 18, 2003).[10]

---

[10] Dumas argued in the district court that Aurand's April 8, 2002 e-mail outlining potential salaries and his response that "something in the 175 to 225 range seems right" constituted an offer (or promise in terms of his promissory estoppel claim) to pay Dumas a salary no lower than $175,000. *See supra* p. 5; *see also* Appellant's Brief at 20 ("In view of Infinity's offer in 2000 to start Dumas at $150,000 and increase his salary over five years . . . a jury could find that [Aurand] was assuring Dumas that he would be offered a position starting at, at least, $175,000 . . . [and] recovery can be had based on promissory estoppel 'when the promise is unambiguous on the downside but not on the upside.'") (citing *Goldstick v. ICM Realty*, 788 F.2d 456, 462 (7th Cir. 1986)). Contrary to Dumas' arguments that these e-mails constitute a "promise or agreement" to employ, we agree with Judge Holderman's finding that "[n]either of these writings establish that a salary was ever actually agreed upon . . . [and] [t]hus, these writings cannot establish to a reasonable certainty the salary of the alleged contract." *Dumas*, 2003 WL 23509644, at *7.

Likewise, Dumas claims that an e-mail he received on May 20, 2002 from Aurand evinces a promise to employ on Infinity's part. *See supra* p. 6. However, in that e-mail Aurand simply outlines

(continued...)

Dumas disagrees with this conclusion and argues instead that "sufficient documentary evidence [of a promise to employ was] submitted to the district court . . . to satisfy the statute of frauds for purposes of [his] promissory estoppel claim," Appellant's Brief at 21, even though that promise was "not definite enough to support a breach of contract claim." Appellant's Reply Brief at 2. As support for his argument he cites to two of this court's opinions in *Goldstick v. ICM Realty*, 788 F.2d 456 (7th Cir. 1986) and *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227 (7th Cir. 1995). However, these cases are distinguishable. In *Architectural Metal Systems, Inc.*, the court was not dealing with the Illinois statute of frauds, but rather was dealing with UCC § 2-201. *See Architectural Metal Systems, Inc.*, 58 F.3d at 1230-31. In addition, we concluded that a written promise, in the form of a price quotation, existed in that case. *See id.* Thus, the statute of frauds was not implicated and did not preclude or otherwise impinge on the plaintiff's claim of promissory estoppel. *Id.* at 1231. Likewise, in *Goldstick* this court declined to decide the question of whether the statute of frauds was applicable to the plaintiff-appellant's promissory estoppel claim due to uncertainty in Illinois law at that time as to whether the

---

[10] (...continued)
what the program would likely consist of if Dumas were to become an employee. We agree with the district court that this e-mail does not "state with a reasonable certainty" the elements of either a promise or a valid, legally enforceable contract. *See Dumas*, 2003 WL 23509644, at *7.

The fact is that none of the documents Dumas presented the court with, either on their own or taken collectively, constitute either a legally binding contract or a "promise or agreement" to employ Dumas. *See JamSports & Entertainment, LLC v. Paradama Productions, Inc.*, 336 F.Supp.2d 824, 849-50 (N.D. Ill. 2004). Thus, just as Dumas' breach of contract claim failed, so too must his promissory estoppel claim, for it is barred by application of the Illinois statute of frauds.

promise at issue could have reasonably been completed within one year. *See Goldstick*, 788 F.2d at 464-66. There is no question that the statute of frauds applies to both of Dumas' claims for promissory estoppel and breach of contract. *See Bank of Marion*, 57 Ill.2d at 124. And, as we have explained, it is the application of the statute of frauds coupled with the lack of any written promise or agreement that defeats his promissory estoppel claim.

This decision is consistent with Illinois case law recognizing that it is only proper to conclude that "if the statute of frauds bars enforcement of an oral contract which cannot be performed within one year, it also bars the courts from using promissory estoppel to *imply the existence* of a contract which cannot be performed within one year." *Dickens*, 245 Ill.App.3d at 1063 (emphasis added). The fact that Dumas has presented a number of written documents, in the form of e-mails, to augment what essentially is an alleged oral contract, does not change the reality that those documents, when viewed in their entirety, do not amount to a written contract. At best, they represent an unenforceable promise or agreement (even assuming a promise or agreement existed) due to the operation of the statute of frauds and cannot form the basis of any claim premised on a theory of contract law or promissory estoppel. After all, there was only one "promise or agreement" at issue here for the purpose of establishing the existence of either a contract or promissory estoppel claim—the alleged promise to employ Dumas. This result may seem harsh, but as a number of Illinois courts have pointed out "the moral wrong of refusing to be bound by an agreement which is not in compliance with the statute of frauds does not warrant the application of the doctrine of promissory estoppel since the breach of a promise which is not regarded as binding under the law is not fraud." *See Dickens*, 245 Ill.App.3d at 1062-63 (citing *Libby-Broadway Drive-In, Inc. v. McDonald's System, Inc.*, 72 Ill.App.3d 806, 810-11, 28 Ill.Dec. 802, 805, 391

N.E.2d 1, 4 (Ill. App. Ct. 1979). Thus, the district court's uncontested determination that the essential elements of a contract did not exist foredoomed his promissory estoppel claim as well, and Dumas was not entitled to "a second bite at the apple."[11] *See All-Tech Telecom, Inc.*, 174 F.3d at 869-70.

---

[11] Although the Illinois Supreme Court has not decided this precise issue, as a federal court sitting in diversity we are charged with predicting how that court would decide if presented with the identical issue. *See Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004). We are convinced that, given the unanimity of the Appellate Courts of Illinois' decisions on this issue and the nature of previous Illinois Supreme Court decisions on the subject, the supreme court would decide as we do today and hold that Dumas' promissory estoppel claim is barred by the statute of frauds. *See Bank of Marion*, 57 Ill.2d at 124; *Quake Constr., Inc.*, 141 Ill.2d at 309-10; *Doyle*, 186 Ill.2d at 118 (Freeman, C.J., concurring in part and dissenting in part, joined by McMorrow, J.); *see also Prentice*, 271 Ill.App.3d at 512; *Raymond*, 202 Ill.App.3d at 708; *Moore*, 155 Ill.App.3d at 785-86.

Indeed, a handful of Illinois Appellate Courts have gone even further and held that promissory estoppel "is not a proper vehicle for direct relief," and is only "meant to be utilized as a defensive mechanism—not as a means of attack." *See DeWitt v. Fleming*, No. 05-04-0016, 2005 WL 846083, at *3 (Ill. App. Ct. 2005) (quoting *ESM Development Corp. v. Dawson*, 342 Ill.App.3d 688, 695, 277 Ill.Dec. 30, 35, 795 N.E.2d 397, 402 (Ill. App. Ct. 2003)). In *DeWitt*, the Appellate Court of Illinois reasoned that "an explicit rule of law that promissory estoppel exists only for defensive purposes in Illinois promotes the stability and integrity of Illinois jurisprudence and provides attorneys practicing in Illinois, as well as their clients, with a clear, stable guidepost to which they may conform themselves." *Id.* However, given the relatively novel nature of these holdings and the lack of comment either by the Illinois Supreme Court or any other Appellate Court of Illinois outside the Fourth and Fifth Districts, we are reticent to speculate as to how the supreme court would deal with the issue. *Cf. Taco Bell Corp.*, 388 F.3d at 1077.

### III.  Conclusion

The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*