In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1171

CERABIO LLC and PHILLIPS
PLASTICS CORPORATION,

*Plaintiffs-Appellees,*

*v.*

WRIGHT MEDICAL
TECHNOLOGY, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03 C 92—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 14, 2004—DECIDED JUNE 13, 2005

Before CUDAHY, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* In this contract dispute,
CERAbio, LLC and its sole member, Phillips Plastics
Corporation (collectively "CERAbio"), claims that it deliv-
ered all of the assets of the corporation, including its
technological know-how, to Wright Medical Technology, Inc.
(Wright), but that Wright failed to pay the remaining half
of the agreed-upon sales price. Wright countered that not
only was the technological knowledge provided by CERAbio

worthless and that it therefore had not performed its end of the deal, but that CERAbio had also committed fraud and had been negligent both in the formation and performance of the contract. Upon CERAbio's motion, the district court granted summary judgment on Wright's tort counter claims. At trial, the jury ruled in favor of CERAbio on the contract claims. On appeal, Wright challenges the district court's ruling on summary judgment as well as an evidentiary ruling at trial. We affirm the summary judgment ruling, but reverse and remand to the district court to correct the effect of the erroneous evidentiary ruling, which we agree was in error.

**I.**

Wright designs, manufactures, and sells medical devices and products, including bone replacement products known as biologics, frequently used during implantation surgery to replace lost bone and provide a framework for new bone growth. In the late 1990's, CERAbio developed a bone replacement product made from tricalcium phosphate ("TCP"). The Food and Drug Administration approved the new product, Apatight, for use in humans as a bone void filler. CERAbio obtained patents for the Apatight production process and material.

In early 2001, Wright representatives learned about Apatight at a trade conference. CERAbio was strictly a research and development company which did not manufacture or sell Apatight or other products commercially. Wright markets and sells biologics worldwide and was looking to expand its product offerings in the bone replacement market, so a match seemed ideal. CERAbio negotiated with Wright to provide Apatight to Wright which Wright would then market and sell. Eventually, the negotiations evolved and Wright decided to purchase substantially all of CERAbio's assets, including all patents and know-how.

Prior to entering into the Agreement, CERAbio informed Wright that it had an established and repeatable process for producing Apatight and that all of the raw materials necessary were commercially available. Under the terms of the August 5, 2002 Agreement between the parties ("Agreement"), Wright agreed to pay $3 million for the CERAbio assets with $1.5 million payable upon closing and a second installment of $1.5 million due no later than three days after Wright verified that it was able to produce Apatight ("Verification"). The contract defined the parameters of Verification and required that CERAbio transfer assets to Wright, that it train Wright's employees, and that Wright produce three test lots of Apatight using the specific work instructions supplied by CERAbio. Wright had sixty days to attempt to produce the three test lots of Apatight in its Memphis facility using commercially reasonable efforts. If it failed to do so, under the Agreement, CERAbio would have the opportunity to access Wright's manufacturing equipment and cooperate with Wright to produce the three Apatight test lots—again, using commercially reasonable efforts.

After the closing, Wright attempted to buy TCP powder, one of the key raw materials needed to manufacture Apatight, but found that it was no longer available. Plasma Biotal, the manufacturer of the necessary TCP powder, had started making a new TCP powder with a different particle size—one that would not work properly utilizing the Apatight manufacturing instructions. Plasma Biotal still had a limited supply of the original powder, but it had become contaminated. Wright and CERAbio dispute when CERAbio became aware that the powder was unavailable and the role that the unavailability of the powder played in the ability to seal the deal. From this point forward, the statements of facts in the two briefs begin to read like two unrelated novels. When the facts are digested, however, it appears that the parties do not wholly dispute the course of events, but instead dispute where the blame lies.

According to the appellant Wright, CERAbio knew prior to closing on the Agreement that the TCP powder was unavailable, but nevertheless represented to Wright that all of the materials necessary to produce Apatight were generally commercially available. To support this claim, Wright points to the deposition of CERAbio's senior product development engineer, Dr. Ying Ko, who testified that CERAbio knew prior to closing that the TCP powder was no longer available. CERAbio does not necessarily disagree that it knew of the availability problem, it focuses instead on the fact that it was possible to work around the problem and to produce Apatight without the original TCP powder. And so while it may have known that one form of the powder was unavailable, CERAbio says, it thought that other powders were available and acceptable alternatives. It thus counters Dr. Ko's testimony by pointing to evidence that Plasma Biotal had assured Dr. Ko that it could produce an "original style" powder. Supp. App. at 4.[1] It further implies also that even if CERAbio did know that the powder was unavailable, the Agreement between the two parties put the onus on Wright to engage in due diligence in order to verify the availability of all necessary materials. Finally, it claims that Wright itself was aware of the powder unavailability problem prior to the closing. CERAbio's spin, in a nutshell, is that the unavailability of the TCP powder was not CERAbio's fault and that with some revisions to the work instructions Apatight could be produced using the new powder, but that Wright never gave CERAbio the chance. It also argues that Wright eventually found a manufacturer who could make a "look-alike" powder but decided instead to shut CERAbio out of the process, produce the virtually identical ceramic bone replacement, Cellplex, on its own,

---

[1] Supp. App. refers to the Supplemental Appendix of Plaintiff-Appellees CERAbio. App. cites refer to the Separate Appendix of Defendant-Counter-Plaintiff-Appellant, Wright, and Short App. cites refer to Plaintiff-Appellees attached required short appendix.

and claim it as its own new creation to avoid paying the remainder of the $1.5 million fee and royalties.[2]

Wright, of course, has a different story to tell. Shortly after closing, CERAbio informed Wright that the instructions had to be changed due to the unavailability of the TCP powder—a problem that CERAbio claimed not to have known about prior to closing on the Agreement. Wright claims that, based on these representations, it consented to oral modifications of the Agreement—permitting CERAbio to make changes to the work instructions and to attempt twelve "pre-verification" production runs over the course of several months. Wright points to evidence that CERAbio did, in fact, know about the availability problem prior to closing and argues that had it known that CERAbio had hidden its knowledge of the unavailability, it never would have agreed to the modification.

In the meantime, in light of the powder unavailability, efforts to resolve the problem proceeded on two fronts. Plasma Biotal tried to replicate the old powder it had been producing originally, and CERAbio employees were working at Wright from late August 2002, to early November 2002, to see if they could alter the work instructions to come up with a process for manufacturing Apatight using the new powder. These attempts were called "pre-verification" efforts since the formal Verification process described in the Agreement could not begin without the old powder or an appropriate substitute. Both parties agree that no successful test lots were produced during this time. CERAbio claims that Verification failed because Wright threw CERAbio's scientists out just as they were on the cusp of success. It did so, says CERAbio, because Wright had independently learned that Plasma Biotal had developed a new "look-a-

---

[2] Under the Agreement Wright was to pay 7.5% royalties on products primarily derived from CERAbio technology and 3% on products incorporating the transferred technology in part.

like" powder that would work in the process and it wanted to proceed to develop the TCP bone replacement product on its own to avoid paying roylaties. CERAbio claims that had it known about the existence of the new powder, it could have completed the Verification process in two or three weeks.

Wright, on the other hand, claims that after two or three months of unsuccessful tries (the exact amount of time is the subject of some debate, but not relevant for these purposes), it became clear to Wright that the effort was fruitless. On November 8, 2002, Wright notified CERAbio that it considered CERAbio to be in breach of the Agreement, and proceeded with its own efforts to produce a bone replacement product.

Both parties agree that Wright eventually succeeded in creating a marketable bone replacement product called Cellplex. Wright, of course, argues that it created Cellplex using a completely different process than the one invented by CERAbio. CERAbio claims that the process for manufacturing Cellplex differs only slightly from the process CERAbio developed to manufacture Apatight and then sold to Wright, and that the two end products are virtually identical.

CERAbio sued Wright for the second $1.5 million installment it believes Wright owes under the Agreement. Wright countered with its own contract claim alleging that CERAbio failed to provide its end of the bargain under the terms of the Agreement and therefore was not entitled to the final payment. In addition, Wright claimed that CERAbio's misrepresentations caused Wright to incur unplanned expenses in excess of $500,000, direct damages of over $880,000, and lost profits as of the time of trial of over $6.7 million.

Wright also counter-sued claiming fraudulent inducement of the contract, fraud in the performance of the contract,

pre-contract negligent representation, and negligent misrepresentation in the performance of the contract. The district court judge granted summary judgment for CERAbio on all of Wright's tort claims. (Wright's contractual claims were not at issue at summary judgment.) His order limited Wright's recoverable damages to direct damages and excluded the possibility of incidental, special, consequential, and punitive damages. Based on this ruling, in preparation for trial, the district court ruled that evidence that pre-dated the closing on the Agreement was not relevant and hence inadmissible. He theorized that any mention of pre-contractual occurrences would constitute an attempt to evade his ruling on summary judgment. The district court referred to his ruling as a "bright blue line" and the parties continue with this nomenclature. Wright claims that this ruling crippled its ability to prosecute the remaining claims and to offer affirmative defenses to CERAbio' claims.

The parties proceeded to trial and at the close of CERAbio's case, the court denied Wright's motion for judgment as a matter of law. Following a jury verdict in favor of CERAbio, the district court entered an amended order of judgment in favor of CERAbio in the amount of $1,407,550 and entered a declaratory judgment of its entitlement to royalties. (Short App. at 101) (R. at 110).

On appeal, Wright challenges the district court's bright blue line evidentiary ruling as well as the ruling on the summary judgment claims for fraudulent inducement, fraud in the performance, pre-contract negligent representation, and negligent misrepresentation in the performance of the contract. We will address the latter first, for if we were to reverse the district court's ruling on the summary judgment claims, there would no longer be a basis for the "bright blue line" ruling.

## II.

### A. Summary Judgment

We review Wright's claims that the district court errone-ously granted summary judgment with a fresh set of eyes—*de novo*—to ensure that, after viewing the facts in the light most favorable to Wright, there remains no genuine issue of material fact and that CERAbio is entitled to judgment as a matter of law on Wright's tort claims. Fed. R. Civ. P. 56(c); *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005).

CERAbio moved the district court for summary judgment on all of the defendant's counter claims other than its claim for breach of contract, namely Wright's counterclaims for pre-contract fraudulent inducement and negligent misrep-resentation, and post-contract fraudulent and negligent misrepresentation in the performance of the contract.

The district court's first task was to determine which state's substantive law applied to the defendant's counter claims. The district court aptly determined that the Delaware choice of law provision in the Agreement applied only to those counterclaims sounding in contract law and not Wright's tort claims. (Short App. at 9-10) (R. at 37, p.9-10). A choice of law provision will not be construed to govern tort as well as contract disputes unless it is clear that this is what the parties intended, *Kuehn v. Children's Hosp., Los Angeles*, 119 F.3d 1296, 1302 (7th Cir. 1997), and there was no clear indication in the Agreement that the parties intended for the choice of law clause to govern tort claims. The district court concluded that under *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) the gov-erning choice-of-law principles were those of Wisconsin, the forum state. Consequently, under Wisconsin's choice of law algorithm, if the laws of the competing states are the same, a court must apply Wisconsin law. *Deminsky v. Arlington Plastics Mach.*, 657 N.W.2d 411, 420 (Wis. 2003); *Sharp v. Case Corp.*, 595 N.W.2d 380, 384 (1999). The district court

reviewed the potentially competing state laws and determined that Delaware, Tennessee, and Wisconsin law would compel the same result. Neither party challenges the district court's conclusion on this matter and our review yields the same finding.

The district court concluded that each of Wright's four tort-based counterclaims was barred by the economic loss doctrine. The economic loss doctrine seeks to preserve the distinction between contract and tort law and to prevent parties from eschewing agreed-upon contract remedies and seeking broader remedies under tort theory than the contract would have permitted. *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462, 467 (Wis. 2004). "Economic loss" for purposes of the doctrine is "the loss in a product's value which occurs because the product is inferior in quality and does not work for the purposes for which it was manufactured and sold." *Id.* (internal citations omitted). The economic loss doctrine "forbids commercial contracting parties (as distinct from consumers, and other individuals not engaged in business) to escalate their contract dispute into a charge of tortious misrepresentation if they could easily have protected themselves from the misrepresentation of which they now complain." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (applying Wisconsin law). In short, parties cannot use tort principles to circumvent the terms of an agreement. *Wausau Tile, Inc. v. County Concrete Corp.*, 593 N.W.2d 445, 451-52 (Wis. 1999). The doctrine's purpose is to "maintain the fundamental distinction between tort law and contract law; protect commercial parties' freedom to allocate economic risk by contract; and encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, 659 (Wis. 2003).

Recently (since the parties briefed the issue on appeal), the Wisconsin Supreme Court has held that the economic

loss doctrine does not apply to claims for the negligent provision of services. *Cease Elec.*, 688 N.W.2d at 472. Wright claims that the contract between itself and CERAbio centered on the provision of services, that is, the installation of equipment, training, and achievement of Verification. CERAbio, on the other hand, maintains that the Asset Purchase Agreement is a contract for the sale of all assets of a business, not a service contract like the one in *Cease Electric*. We agree with CERAbio that the service contract exception should not apply. Our review of the Asset Purchase Agreement confirms that it was indeed a contract for the sale of all of the assets of CERAbio. The fact that some of the assets included technological knowledge and skills that had to be transferred from CERAbio's employees to Wright's employees does not alter the fundamental nature of the contract as one for the sale of goods. Moreover, the policy considerations that prompted the Wisconsin Supreme Court to exempt service contracts from the economic loss doctrine are simply not at play here. Most service contracts, the Wisconsin Supreme Court reasoned (like those to mow the lawn or unclog a drain), are oral and informal and parties rarely hire attorneys to allocate risks and limit remedies. *Cease Elec.*, 688 N.W.2d at 470-71. In many service contracts, furthermore, the information disparities between the parties make it unlikely that each party can negotiate the terms with the same level of bargaining power. *Id.* at 471. None of these policy considerations apply in this case. Wright and CERAbio, both well-represented, sophisticated business parties, drafted complex, detailed agreements which could and indeed did allocate risks and assign remedies. We conclude, therefore, that the economic loss doctrine applies.

The question then becomes whether there are any exceptions to the economic loss doctrine that might keep Wright's tort claims alive. The district court correctly discerned that Wisconsin recognizes a fraud in the inducement exception

to the economic loss doctrine. (Short App. at 13) (R. at 37, p.13) (citing *Digicorp*, 662 N.W.2d at 662). The court below, however, incorrectly stated that the Wisconsin Supreme Court had expressly adopted a narrow exception akin to the one announced in a Michigan case—*Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995). That very narrow exception limits fraud in the inducement claims to situations where the claimed fraud is extraneous to, rather than interwoven with the contract, that is, where the fraud concerns those matters that were not expressly or impliedly addressed in the contract. *Digicorp*, 662 N.W.2d at 662. *Digicorp*, however, did not so hold. Although four justices of the five-member court recognized some form of a fraud in the inducement exception to the economic loss doctrine, only two justices announced their recognition of a narrow *Huron-Tool*-like exception.[3] *Id.* at 662. Two justices dissented announcing that they would have upheld the previous broad exception set forth in *Douglas-Hanson Co. v. BF Goodrich Co.*, 598 N.W.2d 262 (Wis. Ct. App. 1999), *aff'd*, 607 N.W.2d 621 (Wis. 2000), allowing a plaintiff to make a claim for intentional misrepresentation when the misrepresentation fraudulently induces a plaintiff to enter into a contract. *Digicorp*, 662 N.W.2d at 670. A third justice concluded in a dissent that any fraud in the inducement exception was unnecessary. *Id.* at 667. In short, a majority (three) of the justices overruled the broad exception announced in *Douglas-Hanson*, but a separate, but different three-member majority rejected the narrow *Huron Tool* exception. *See Tietsworth v. Harley Davidson, Inc.*, 677 N.W.2d 233, 243-44 (Wis. 2004). The most we can discern from *Digicorp*, therefore, is that the fraud in the inducement exception to the economic loss doctrine is more narrow than that announced in *Douglas-Hanson* and that it does not apply

---

[3] Two justices on the seven-member court did not participate in the decision at all.

when the fraud pertains to the character and quality of the goods that are the subject matter of the contract. *Id.* at 244.[4]

This is enough information, however, for us to conclude that the fraud in the inducement exception should not apply to the specific facts of this case. Recall that the purpose of the fraud in the inducement exception is to address the "special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Digicorp*, 662 N.W.2d at 662 (quoting *Huron Tool*, 532 N.W.2d at 545). It does not address the situation where "the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, [as] the

---

[4] Like Wisconsin, Delaware and Tennessee also limit the fraud in the inducement exception to matters not expressly addressed in the contract. *See Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 172 (Tenn. Ct. App. 2001) ("Courts should be particularly skeptical of business plaintiffs who—having negotiated an elaborate contract or having signed a form when they wish they had not—claim to have a right in tort whether the tort theory is negligent misrepresentation, strict tort, or negligence."); *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg., Inc.*, No. Civ. A. 98C-02-217WCC, 2002 WL 1335360, *5 (Del. Super. Ct. June 13, 2002) ("The economic loss doctrine. . . forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature . . . . While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item."). (Citation to unpublished authority is permissible pursuant to Del. Sup. Ct. R. 14(b)(vi)(4), and therefore permissible pursuant to our Circuit Rule 53(e). *See also New Castle County v. Goodman*, 461 A.2d 1012, 1013 (Del. 1983)).

other party is still free to negotiate warranty and other terms to account for possible defects in the goods." *Id.* Tort remedies are inappropriate where commercial contracting parties could have easily protected themselves from the misrepresentation of which they now complain. *All-Tech Telecom*, 174 F.3d at 866. In this case, the parties to the contract were two sophisticated and well-represented business entities. The crux of their agreement centered around the sale and purchase of the assets of CERAbio's business— primarily a process for producing Apatight. Wright's primary concern should have been, and indeed was, whether it was purchasing a process that could be replicated by Wright. Of course, if it could not, Wright would be paying $3 million dollars for a product with no value to it. Wright was free to, and in fact did, negotiate warranty and other terms to account for the possibility that the process could not be replicated. Wright's remedies, therefore must be limited to contract claims.

As we have cautioned before, we do not mean to imply that the tort of misrepresentation is abolished in all cases in which the plaintiff and defendant are commercial entities with a pre-existing contractual relationship. *Id.* at 866. The fraud in the inducement exception to the economic loss doctrine, however, does not apply in this particular case where two sophisticated commercial entities created contractual remedies to address the concern that the product Wright was purchasing from CERAbio might not result in the desired outcome either because the process was not repeatable or because the starting materials were not available. The alleged fraud in this case pertains to the character and quality of the product that is the subject matter of the contract. *See Tietsworth*, 677 N.W.2d at 244. "Misrepresentations such as these, that ultimately concern the quality of the product sold, are properly remedied through claims for breach of warranty." *Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co., Inc.*, 123 F.3d 675, 682 (7th Cir. 1997).

Whether or not the process was repeatable was addressed contractually by the complex process set forth in the contract for Verification. The agreement between the parties was contingent upon Wright producing three test lots meeting the specifications outlined in the Agreement. Of course, if the starting materials were not available, Verification could not be achieved. The Agreement addressed the availability of starting materials in another manner as well. The disclaimer of warranty provision contained in the Non-Disclosure Agreement specified that CERAbio provided all information to Wright on an "as is" basis and that CERAbio:

> makes no warranty, either express or implied, concerning the Information, including, without limitation, its accuracy, completeness, or to the non-infringement of intellectual property rights or other rights of third persons or Discloser. **Recipient assumes all risk** in, and Discloser will not be liable for any damages arising out of, use of information including, without limitation, business decisions made or inferences drawn by Recipient in reliance on the Information or the fact of the disclosure of the Information.[5, 6]

(App. at 1078-79) (R. at 36, Ex. A, ¶ 8) (emphasis ours). This type of disclaimer is referred to as a non-reliance clause. Furthermore, the integration clause in the asset purchase agreement incorporates this non-disclosure agreement and likewise allocates to Wright the risk that the information provided by CERAbio might be incomplete or incorrect. This clause states:

---

[5] Information is defined as "all information furnished by the Discloser to Recipient, whether or not Confidential Information . . . ." (App. at 1078) (R. at 36, Ex. A, ¶ 8).

[6] The Asset Purchase Agreement contains an integration clause that incorporates the parties' Non-Disclosure Agreement. (App. at 739, ¶ 10.7) (R. at 2, Ex. A, ¶ 10.7).

This Agreement, including schedules and exhibits referred to herein, and the NDA [Non-Disclosure Agreement] embody the entire agreement and understanding of the parties hereto . . . . There are no restrictions, promises, representations, warranties, covenants or undertakings of Seller contained in any material made available to Buyer pursuant to the terms of the NDA, or the correspondence between Seller and Buyer.

(App. at 739, ¶ 10.7) (R. at 2, Ex. A, ¶ 10.7).

These provisions allocated to Wright the risk that the information provided by CERAbio might be incomplete or incorrect. Wright assured CERAbio in writing that it would not rely on information provided by CERAbio. Not only does this non-reliance clause verify that the alleged fraud was interwoven with the parties' contractual agreement, and thus barred by the economic loss doctrine, it also confirms the district court's finding that Wright could not have reasonably relied on CERAbio's oral representation as to the viability of the process or the availability of starting materials.

Wright challenges the proposition that commercial parties can never demonstrate reasonable reliance on misrepresentation in the face of a non-reliance clause. For this portion of the dispute, we must consider the force and effect of a clause in the contract—the non-reliance clause—which the parties agreed to construe in accordance with Delaware law. Although the Delaware Supreme Court has offered no definitive conclusion, recent opinions of the Delaware chancery courts have repeatedly concluded that "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 (Del. Ch. 2003). *See also Kronenberg v. Katz*, ___ A.2d ___, No. Civ. A. 19964, 2004 WL 1152282, at * 17 (Del. Ch. May 19, 2004);

*Progressive Int'l Corp. V. E.I. Du Pont De Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) ("sophisticated parties may not rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations."); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001) (same).

Wright lashes at this windmill of Delaware authority by arguing that none of the cases established a *per se* rule that commercial parties can never demonstrate reasonable reliance on misrepresentations in the face of a purported non-reliance clause. Wright claims instead that those courts made fact-specific determinations about whether plaintiffs could have reasonably relied upon the defendants' misrepresentations. This may, in fact, be the case, but it does not get Wright anywhere. The relevant facts in *Great Lakes* have a familiar ring. The case involved "two highly sophisticated parties, assisted by industry consultants and experienced legal counsel, [who] entered into carefully negotiated disclaimer language after months of extensive due diligence . . . [and who] explicitly allocated their risks and obligations in the Purchase Agreement." *Id.* at 555. Noting the carefully negotiated and crafted nature of the agreements, the *Great Lakes* court concluded that "to allow [the buyer] to assert, under the rubric of fraud, claims that are explicitly precluded by contract, would defeat the reasonable commercial expectations of the contracting parties and eviscerate the utility of written contractual agreements." *Id.* at 556. The same is true here.

This philosophy is not unique to the Delaware courts. This court and others have held that a written anti-reliance clause in a stock purchase agreement precludes any claim of deceit by prior representations. *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000). In *Rissman* we pointed out that a non-reliance clause is part of the negotiated bargain.

*Id.* at 384. CERAbio could have assumed the risk of claims based on oral statements it made, but it likely would have increased the purchase price accordingly. *Rissman*, 213 F.3d at 388. *See also Cook v. Little Caeser Enters., Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (applying Michigan law and concluding that the existence of an integration clause in the franchise agreements made the buyer's alleged reliance on prior representations unreasonable); *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1522 (11th Cir. 1993) (a buyer who signs an agreement that provides in essence that no representation, promise or inducement not included in the contract shall bind any party cannot later claim damages for fraud); *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) ("a specific disclaimer in an agreement destroys the allegations in a plaintiff's complaint that the agreement was executed in reliance upon contrary oral representations."). Even were we to take a less absolute, case-by-case assessment of the validity of the non-reliance clause (as urged by the concurrence in *Rissman*), our conclusion would not differ. In this case the parties were sophisticated commercial entities assisted by counsel and the facts surrounding the materiality and intentionality of the misrepresentation are highly contested. *See Rissman*, 213 F.3d at 388 (Rovner, J., concurring) (considering factors that might be relevant in determining whether an investor's reliance on prior statements was reasonable despite the existence of a non-reliance clause). We are not unsympathetic to the notion that Wright was purchasing a secret process and therefore in all likelihood it could not investigate independently whether the starting materials were commercially available, but "[c]ontractual language serves its function only if enforced consistently," *id.* at 385, and parties to contracts are best served by rulings enforcing the express terms of agreements into which they enter.

Wright and CERAbio bargained for the allocation of risks contained in the Agreement and Wright accepted the risk that it might receive faulty oral information from CERAbio. The district court correctly concluded, therefore, that Wright's counterclaim for fraudulent inducement could not stand.

Wright's other counterclaims allege negligent misrepresentation in the formation of the contract, negligent misrepresentation in the performance of the contract, and fraud in the performance. Any economic loss caused by these acts, however, is best addressed through the contractual remedies to which the parties agreed.

For example, Wright claims that CERAbio negligently misrepresented information that induced Wright to enter into the Agreement. Although the Wisconsin Supreme Court has not yet specifically addressed the economic loss doctrine in this context, the appellate courts have laid the ground work. *See Selzer v. Brunsell Bros., Ltd.*, 652 N.W.2d 806, 831-32 (Wis. Ct. App. 2002) (economic loss doctrine prevents tort claims for negligent misrepresentation); *Kailin v. Armstrong*, 643 N.W.2d 132, 146 n.20 (Wis. Ct. App. 2002) (noting that the Wisconsin appellate courts have applied the economic loss doctrine to bar a negligent misrepresentation that induced a contract); *Prent Corp. v. Martek Holdings, Inc.*, 618 N.W.2d 201, 208 (Wis. Ct. App. 2000) (economic loss doctrine bars recovery for negligent misrepresentation to a commercial buyer of a product). It is no stretch to assume that the Wisconsin Supreme Court would follow suit. In describing the policy reasons surrounding the economic loss doctrine, that court has followed a path that protects commercial parties' freedom to allocate economic risk and encourages the party best situated to assess the risk of economic loss, and to assume, allocate, or insure against that risk. *See Digicorp*, 662 N.W.2d at 659. For the same reasons, we conclude that the district court was correct in determining that the economic loss doctrine would

preclude Wright's claims that CERAbio negligently or fraudulently misrepresented information during the performance of the contract to convince the defendant that verification had occurred. (Short App. at 25) (R. at 37, p.25). These are simple contract claims disguised in tort claim clothing. If CERAbio breached its duties to perform its tasks during Verification, Wright's remedy lies in contract.

Wright argues that Tennessee law applies to its post-contract fraud claims. But under Tennessee law, like Wisconsin law, we see no support for allowing Wright to wrap its contract claims in tort language. In *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 133 (Tenn. 1996), the Tennessee Supreme Court made clear that it was joining the economic loss doctrine bandwagon noting that negligence theory was an inappropriate method to resolve injuries causing economic loss (in the *Ritter* case, from product liability). *Id.* "When a product does not perform as expected," the *Ritter* court went on to explain, "the buyer's remedy should be governed by the rules of contract, which traditionally protect expectation interests." *Id.* n.8. This conclusion followed logically from a much earlier Tennessee Supreme Court decision ruling that a cause of action for breach of contract—even negligent or fraudulent—remains in contract rather than tort. *Mid-South Milling Co. v. Loret Farms, Inc.*, 521 S.W.2d 586, 588 (Tenn. 1975). The Tennessee appellate court has applied *Ritter* and *Mid-South Milling* to a contract for the sale of goods, holding that "[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by contract." *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001). The *Trinity Indus.* court noted the breadth of the economic loss doctrine in Tennessee stating, "[c]ourts should be particularly skeptical of business plaintiffs who—having negotiated an

elaborate contract . . . claim to have a right in tort whether the tort theory is negligent misrepresentation, strict tort, or negligence." *Id*. at 172.

For these reasons we uphold the district court's ruling granting summary judgment to CERAbio on Wright's counter claims sounding in tort.

## B.  The Evidentiary Ruling

Based on its ruling that CERAbio was entitled to summary judgment on all of Wright's fraud claims, the district court concluded that any evidence submitted by Wright that pre-dated the closing on the Agreement would constitute an attempt by Wright to reintroduce the fraud argument and circumvent the ruling. Consequently, the district court created a "bright blue line rule." "Is it before the contract was entered into? It's out. Is it afterwards? If indeed there's no evidentiary objection to it other than that, it goes in. That's the blue line." (Short App. 52:10-13) (R. at 112, p.25:10-13). *See also* (Short App. 64:10-17) (R. at 112, p.40) ("Pre-contract is not relevant. It's not going to go to the jury because all you're doing is attempting to avoid the ruling of this Court in its Memorandum and Order on Summary Judgment . . . I've already put my line in the sand. I've made a bright blue line and that's where it stays."). Wright argues that the bright blue line rule prevented it from presenting its defenses to the claim that the contract had been modified, prevented it from impeaching one of CERAbio's star witnesses regarding inconsistencies in his testimony, and prevented Wright from presenting relevant and admissible contextual evidence regarding what constituted a reasonable time for performance of the Agreement.

We review a district court's decision regarding the admissibility of evidence for abuse of discretion. *U.S. v. Redditt*, 381 F.3d 597, 600-01 (7th Cir. 2004). We give particularly

great deference to the trial court's decision weighing probative value against prejudice. *Speedy v. Rexnord Corp.*, 243 F.3d 397, 404 (7th Cir. 2001). Even if error is found, we will not reverse a verdict if the error was harmless. *U.S. v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004). A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, *Bintz v. Bertrand*, 403 F.3d 859, 869 (7th Cir. 2005), and the result is inconsistent with substantial justice. *Mihailovich v. Laatsch*, 359 F.3d 892, 913 (7th Cir. 2004), *cert. denied*, 125 S. Ct. 345 (2004); *Shick v. Ill. Dept. of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). Although this is a tough hurdle to cross, it is not impossible. We have not hesitated to overturn blanket evidentiary rulings where we were not satisfied that the district court exercised sufficient discretion. *See Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir. 1987) (finding that a blanket exclusion of evidence of events that occurred before a particular time was arbitrary and warranted a new trial). *See also Mihailovich*, 359 F.3d at 913-14 (an overbroad exclusion of all evidence regarding prior accidents on a dangerous roadway created a significant chance that the outcome of the trial was affected); *Pub. Serv. Co. of Ind., Inc. v. Bath Iron Works Corp.*, 773 F.2d 783, 790 (7th Cir. 1985) (exclusion of evidence precluded the defendant from presenting its complete case and thus prejudiced its substantial rights). In *Riordan*, this court overturned a blanket exclusion of evidence made along strict temporal lines—in that case all events occurring after the plaintiff filed her discrimination claim. *Riordan*, 831 F.2d at 698-99. We noted that the district court should have used its discretion to consider the evidence individually. *Id.* In this case, the trial court's bright line exclusion of all pre-Agreement evidence created an arbitrary barrier to evidence that Wright should have been permitted to present at trial. The availability *vel non* of the TCP powder goes to the heart of the defense that Wright posed to CERAbio's contract claim as well as Wright's own claim for breach of

contract. Consequently, we must conclude that this blanket exclusion of a fundamental piece of Wright's case without any individualized determinations of prejudice affected the fairness of the judicial proceeding and had a substantial influence over the jury's determination.

The trial court was legitimately concerned that Wright would try to place before the jury matters that the court had resolved on summary judgment—fraudulent inducement of the contract, fraud in the performance of the contract, pre-contract negligent representation, and negligent representation in the performance of the contract. The bright blue line, however, not only excluded evidence relevant to these claims, but also excluded legitimate evidence relevant to Wright's defenses and surviving counter claims. For example, Wright wished to argue that CERAbio obtained Wright's agreement to alter the work instructions in the original Agreement through fraud. According to Wright, it would have argued that the agreement to modify the contract was invalid as it was not supported by mutual assent and consideration as required under Delaware law. *See Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. Ct. 2000). The post-contract fraud alleged by Wright involved the status of CERAbio's pre-contract knowledge and therefore there was no way for Wright to present its case for fraud to the jury under the bright blue line rule. As a result, Wright claims that the jury was left with the erroneous impression that the parties had mutually, and in good faith, agreed to modify the work instructions as a result of a glitch unknown to and unpreventable by either party.

According to Wright, CERAbio fraudulently induced Wright to modify the Agreement by telling Wright that the unavailability of the TCP powder was an unexpected and recently discovered event. After the Agreement had been executed, CERAbio's president, James Cassidy, wrote a letter to Wright stating that the unexpected unavailability

of the TCP powder had rendered meaningless the original instructions in the Agreement and therefore a modification to the original work instructions was necessary in order to proceed. The relevant portion of that letter stated,

> Nothing in the Asset Purchase Agreement states that the Work Instructions are set in stone and that they may not be changed, if an event occurs that renders them meaningless. Such an event has occurred. . . . This event, as you are well aware, is the complete unavailability of Old Powder, that was used in developing Work Instructions and that is used in the process. . . . *CERAbio was not aware of this change prior to Closing.*

(App. at 952) (R. at 33, ex. C, p.2) (emphasis ours). Wright's position is that the unavailability was neither unexpected nor unknown and points primarily to the testimony of CERAbio's senior product development engineer, Dr. Ko who stated in his deposition that CERAbio was aware of the powder supply problems prior to closing on the Agreement. (App. 133) (R. at 50, ex. E, p.161). Had it known of the deception, Wright claims, it would not have agreed to modify the Agreement. Although Wright does not describe what course of action it would have taken, presumably it would have immediately declared CERAbio to be in breach and terminated the contract. Although the district court granted summary judgment to CERAbio on Wright's fraudulent inducement and fraudulent performance claims, claims regarding modification of the contract had not been excluded by the summary judgment ruling, and evidence that CERAbio fraudulently induced Wright to agree to modify the Agreement was relevant and should have been considered for admission like any other relevant evidence. The trial court gave no explanation as to why each individual piece of evidence would be unduly prejudicial, and barring such an explanation the decision to exclude the evidence was arbitrary. By prohibiting all pre-Agreement evidence, the trial court threw out the baby with the bath water; all

evidence of fraudulently induced modification was thrown out, not just evidence of fraud in the inducement of the original contract and fraud in the performance of that contract—the two issues that had been resolved on summary judgment.

It is easiest to see the erroneous overbreadth of the bright blue line ruling when considering Wright's claim that it was precluded from entering evidence that CERAbio failed to perform its end of the contract in a commercially reasonable amount of time. This argument does not significantly tread on the territory covered by the summary judgment order, but was excluded nonetheless by the bright blue line rule. Wright claims that it was entitled to enter evidence of the interactions between the two parties prior to signing the Agreement to give context to the terms, "commercially reasonable time."

Paragraph 8.7 of the Agreement states, in part:

> In the event Buyer is unable to produce three (3) Test Lots meeting the Specifications within sixty (60) days following the Closing Date, Buyer shall so notify Seller, and shall allow Seller's representatives access to the Manufacturing Equipment and otherwise reasonably cooperate with Seller to determine the causes of the failure to produce such Test Lots. If Buyer and Seller are unable to determine the causes of the failure to produce such Test Lots, then Buyer shall allow Sellers representatives to utilize the Manufacturing Equipment and materials necessary to produce Test Lots during normal business hours, and Seller shall use its commercially reasonable efforts to produce three (3) Test Lots meeting the Specifications.

(App. at 733) (R. at 2, Ex. A, ¶ 8.7). Although the Agreement sets forth a specific number of days for production of test lots by Wright if Verification was not possible, the Agreement allows CERAbio to come in and produce the test

lots itself in a "commercially reasonable amount of time." *Id.* Under Delaware law, if a contract does not specify a time period for performance, the court will infer a reasonable time for performance. *Allen v. Pictsweet Co.*, No. Civ. A. 03C-07-026 ES, 2004 WL 2240640, at *3 (Del. Super. Ct. Sept. 20, 2004), *judgment amended*, No. Civ. A. 03C-07-026ESB, 2004 WL 2827860 (Del. Super. Ct. Nov. 18, 2004).[7] The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct—in this case the reasonable time for CERAbio to produce test lots after Verification failed. *See Continental Ins. Co*, 750 A.2d at 1234. Wright argues that it was entitled to introduce pre-contract evidence regarding its expectations and the relationship between the parties to assist the jury in determining whether CERAbio had a reasonable time to perform. For example, Wright would have submitted evidence that initially it had considered merely purchasing Apatight from CERAbio in a vendor arrangement and that during the months the two parties discussed this arrangement, CERAbio was ready and able to produce samples of Apatight to Wright. Wright assumed from this, and from other information provided by CERAbio, that CERAbio could readily produce Apatight and that if Wright purchased CERAbio's assets and know-how, it also could produce Apatight and enter the market quickly. This evidence was not related to fraud or negligence and therefore the blanket exclusion of pre-contract evidence excluded relevant evidence unrelated to the issues that had been resolved at summary judgment.

Wright also claims that the excluded evidence could have been used to impeach the credibility of CERAbio's president, James Cassidy. Recall that Cassidy wrote a letter to

---

[7] *See supra* note 4. Citation to unpublished authority is permissible pursuant to Delaware Supreme Court Rule 14(b) (vi), and therefore permissible under our Circuit Rule 53(e). *See also New Castle County v. Goodman*, 461 A.2d 1012, 1013 (Del. 1983).

Wright stating that he had only learned of the powder problem after the closing of the Agreement. Wright claims that Cassidy also testified at trial that he only learned of the powder's unavailability after closing, although we think Cassidy's testimony on this point was somewhat ambiguous.[8] Wright wished to give the jury evidence that Cassidy knew that the powder was unavailable *before* the parties entered into the Agreement. To do so, it planned to point to the deposition testimony of Dr. Ko and several e-mail exchanges to impeach Wright on this point and attack his credibility. Wright claims that because Cassidy was one of only two live witnesses called at trial, his credibility was particularly important and was relevant to the jury's determination of whether his testimony regarding many other facts essential to CERAbio's claims should have been believed. These included the adequacy of CERAbio's training of Wright employees and CERABio's progress toward Verification. Although this type of impeachment evidence is not certain to affect the jury's determinations, we think the cumulative prejudice imposed by the blanket exclusion of all pre-Agreement evidence created a substantial and injurious influence on the jury's determinations and was inconsistent with substantial justice.

Because the exclusion of the evidence likely would have affected the jury's conclusions, Wright is entitled to a new trial absent the arbitrary bright blue line rule that was previously imposed. We emphasize that the district court need not allow all pre-contractual evidence in, and may continue to exclude evidence that might circumvent the court's ruling

---

[8] Wright's attorneys asked Cassidy the following compound question: "Now, sir, you had mentioned that you were working—that after the closing when you discovered that the old powder was no longer available you told Wright Medical that, correct." It is unclear whether Cassidy's simple "yes" response to this compound question meant that he had informed Wright or that he knew of the problem prior to closing. (App. 383) (R. at 113, p.1-111:17-21).

at summary judgment or other evidence where the prejudice outweighs the probative value. The court, however, will have to make such determinations on a case-by-case basis rather than relying on an inflexible temporal line. This conclusion makes it unnecessary for us to consider whether the court erred by denying Wright's motion for judgment as a matter of law. Furthermore, we leave it to the discretion of the trial court to determine whether Wright is entitled to a jury instruction that the mutual assent required to support a contract modification is negated where that assent is obtained by fraud. Whether or not such an instruction is warranted will depend on which evidence the trial court ultimately allows in under its case-by-case analysis.

## C. Damages

Like the other evidentiary rulings, we review the district court's decision to exclude Wright's damages expert for abuse of discretion only. *Redditt*, 381 F.3d at 600-01. Consequential damages were specifically precluded by the Agreement:

> 9.4.2 In no event shall any party be liable to another party for any incidental, special or consequential damages of any nature, including but not limited to loss of profits, loss of use of the Assets or revenue, expenses involving cost of capital, or claims of customers, whether such damages are a result of breach of this Agreement or otherwise.

> (App. at 737) (R. at 2, Ex. A, ¶ 9.4.2).

Judge Shabaz determined that the damages calculated by Wright's expert, Daniel Gotter represented prohibited consequential damages, and we see no evidence that he abused his discretion on this matter.

## III.

For the foregoing reasons, we affirm in part, and reverse and remand in part for further proceedings consistent with this opinion. The parties shall bear their own costs of appeal.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*