In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 16-2331 and 16-2953

ADM ALLIANCE NUTRITION, INC.,

*Plaintiff-Appellant*,

*v.*

SGA PHARM LAB, INC., and SHAWN YU,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Central District of Illinois.
No. 16 CV 02042 — **Colin S. Bruce**, *Judge*.

———————————

ARGUED DECEMBER 9, 2016 — DECIDED DECEMBER 14, 2017

———————————

Before WILLIAMS and HAMILTON, *Circuit Judges*, and
CHANG, *District Judge*.[*]

WILLIAMS, *Circuit Judge*. SGA Pharm Lab had supplied
ADM Alliance Nutrition with a product used to make medicated animal feed. The parties ended their relationship by
signing a termination agreement. After that agreement was

---

[*] Of the United States District Court for the Northern District of Illinois, sitting by designation.

signed, ADM came to believe that SGA had made false representations concerning the potency of the product while SGA was supplying it to ADM. ADM brought breach of contract and fraud claims against SGA and its president, and the district court concluded that ADM had released the claims. We agree. The termination agreement stated ADM released SGA and its officers from any and all claims, whether known or unknown, so by its terms the release includes claims for breach of contract and fraud. The agreement also stated that it superseded all prior understandings and that no representations were made to induce the other party to enter into the agreement other than those it contained. In this case, between sophisticated commercial parties, we conclude that judgment in favor of SGA and its president was proper.

## I. BACKGROUND

The roots of this lawsuit began when SGA agreed to source a product for ADM Alliance Nutrition called Chlortetracycline which ADM would use when it manufactured medicated animal feed. SGA and ADM entered into a Purchase and Development Agreement on February 7, 2013. This agreement required SGA to provide a signed and dated Certificate of Analysis which detailed the potency of the product for each production lot it shipped to ADM. SGA's compensation was based in part on the potency of the product as spelled out in the signed Certificates of Analysis. The Purchase Agreement

also provided that if ADM attempted to sell any of the NA-DAs[1] that were the subject of the agreement during the agreement's term, SGA had the first option to purchase. If SGA did not exercise its option, it would receive up to 20% of the sale price received by ADM based on performance metrics defined in an exhibit to the agreement.

ADM later received an offer from a third-party buyer to purchase the NADAs. SGA declined to exercise the right of refusal granted to it in the Purchase Agreement, and on September 12, 2014, ADM and SGA entered into a Termination and Settlement Agreement ending their business relationship. The agreement stated that the parties "now wish to agree upon the compensation to be paid to SGA under Section 9.5 of the Purchase and Development Agreement and terminate the Purchase and Development Agreement." The Termination Agreement required ADM to pay SGA $750,000 within two days of the date ADM closed on the sale to the third-party buyer.

ADM alleged in this lawsuit that Shawn Yu, SGA's president, signed Certificates of Analysis that overstated the potency of Chlortetracycline. ADM asserted that the overstatement of the product's potency meant that ADM overpaid SGA and Yu more than $1.1 million. ADM also alleged that it would not have paid the $750,000 it paid SGA and Yu under the terms of the Termination Agreement had ADM known that the product's potency was misrepresented. ADM's complaint asserted claims for breach of contract against SGA,

---

[1] Neither the Purchase Agreement nor the parties define the term, but it appears to stand for "New Animal Drug Application." *See* 21 C.F.R. § 514.3.

fraud against SGA, and fraud against Yu. The complaint attached both the Purchase Agreement and the Termination Agreement as exhibits.

SGA and Yu filed a motion to dismiss the complaint. The district court construed SGA and Yu's motion as a motion for judgment on the pleadings and granted the motion in their favor. The district court also awarded SGA and Yu $23,685 in attorneys' fees. ADM appeals.

## II. ANALYSIS

### A. No Error in Treating Motion to Dismiss as Motion for Judgment on Pleadings

ADM argues that the district court was wrong to treat SGA and Yu's motion to dismiss as a motion for judgment on the pleadings. Although SGA and Yu filed a motion to dismiss invoking Federal Rule of Civil Procedure 12(b)(6), the premise of their motion was that the release language in the Termination and Settlement Agreement barred ADM's claims. Release of a claim is an affirmative defense. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 860 (7th Cir. 2015). As a result, SGA and Yu should have raised release as an affirmative defense and then moved for judgment on the pleadings under Rule 12(c). *See id.*

We have found the failure to move for judgment on the pleadings to be harmless when "all the facts necessary to rule on the affirmative defense are properly before the district court on the motion to dismiss." *Id.* at 861. Federal Rule of Civil Procedure 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." ADM attached both the Purchase Agreement and the Termination Agreement to its complaint

and repeatedly relied on them in its complaint, so we consider those documents in reviewing the grant of the motion for judgment on the pleadings. *See Williamson v. Curran*, 714 F.3d 432, 435–36 (7th Cir. 2013). SGA and Yu's motion to dismiss pointed to the Termination Agreement as the source of the release. The language of the release was properly before the district court on the motion to dismiss.

ADM also contends that judgment against it came too soon because it did not have the opportunity to address SGA and Yu's release argument. But ADM has never suggested what amendments it could make to its complaint that would alter the analysis of the release defense asserted by SGA and Yu. *See Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 603 (7th Cir. 2014). No amendments or discovery would change the terms of the release.[2] *See Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 976 (7th Cir. 2013) ("[E]ven if the district court allowed discovery, and everything Yassan alleged proved to be true—Yassan's case would still fail under the terms of the release."). The district court committed no error in construing the motion to dismiss as a motion for judgment on the pleadings.

### B. Judgment on Pleadings Proper

We review a grant of judgment on the pleadings de novo. *Landmark Amer. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016). To survive a motion for judgment on the pleadings (or a motion to dismiss), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Katz-Crank v. Haskett*, 843 F.3d 641,

---

[2] For similar reasons, we find no abuse of discretion in the district court's decision to grant SGA leave to file a reply brief.

646 (7th Cir. 2016). In undertaking our review, we draw all reasonable inferences and facts in favor of the non-moving party. *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015).

ADM maintains that its complaint states actionable claims for fraud and breach of contract that are not barred by the release language in the Termination Agreement. It contends that SGA breached the terms of the Purchase Agreement by overstating the potency of Chlortetracycline in the Certificates of Analysis. ADM also maintains that SGA and Yu committed fraud by knowingly overstating the product's potency. SGU and Yu, on the other hand contend that the terms of the Termination Agreement foreclose ADM from bringing the claims it asserts in this suit.

ADM asserts that its complaint sets forth all the elements of fraud and breach of contract claims. But a release is an affirmative defense, so if a release bars a plaintiff's claims, whether the complaint states a claim does not matter. *See Yassan*, 708 F.3d at 975 ("The problem with [the plaintiff]'s case is not that he failed to state a claim; the problem is that he signed a release waiving the right to make a claim."). Our principal question is whether the Termination Agreement releases the claims ADM now asserts.

A release is "the abandonment of a claim to the person against whom the claim exists." *Borsellino v. Putman*, 962 N.E.2d 1000, 1019 (Ill. App. Ct. 2011) (quotations omitted). Under Illinois law, which governs both the Purchase and Termination Agreements, a release within a settlement agreement is governed by contract law. *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014). When a release is unambiguous, a

court must construe it as written without looking to parol evidence. *Cannon*, 752 F.3d at 1091; *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Because the language of the agreements is so important in determining whether the claims were released here, we will be quoting several provisions.

Paragraph four of the Termination Agreement stated:

… the parties agree that, effective as of the date of Closing, the Purchase and Development Agreement shall terminate and shall be of no further force or effect, and all of the obligations, rights, and duties under the Purchase and Development Agreement shall terminate ….

The Termination Agreement also included two reciprocal release provisions that released the SGA parties and ADM parties. The release of the SGA parties in paragraph five stated:

Conditioned upon SGA complying with its duties, obligations and covenants set forth in this Agreement, effective as of the Payment Date, ADM hereby fully, completely, irrevocably and unconditionally releases, remises, acquits, and forever discharges SGA and its directors, officers, shareholders, members, managers, employees, agents, representatives, successors and permitted assigns (collectively, the "SGA Parties") of and from any and all charges, complaints, claims, promises, agreements, controversies, actions, causes of action, damages, suits, rights, expenses, losses, liabilities and obligations of any nature whatsoever (including attorneys' fees and costs actually incurred) (collectively, "Claims"), whether legal or equitable, whether known or unknown, that ADM may have against one

or more of the SGA Parties arising out of, related to, or in connection with the Purchase and Development Agreement, including, but not limited to, SGA's right of first refusal and the compensation due to SGA pursuant thereto: provided, however, this release shall not apply to the duties, covenants, and obligations of SGA set forth in this Agreement.

The language in these paragraphs is clear: it releases SGA and Yu from any and all claims arising out of the Purchase Agreement.

It is true that fraud (or breach of contract) is not specifically listed in the release. But "the fact that a claim is not specifically listed in the release does not necessarily preclude that claim from having been within the contemplation of the parties and therefore barred." *Miller v. Lawrence*, 61 N.E.3d 990, 998 (Ill. App. Ct. 2016); *see also Wagner v. NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996) (applying Illinois law) ("When a release is broadly worded, as this one was, to cover all claims, 'known and unknown,' the plaintiff is giving up the right to sue that she might otherwise have on claims related to her employment that could arise under any law."). Paragraph five of the Termination Agreement provided that ADM released SGA and its officers from "*any and all charges*, complaints, claims, … actions, causes of action, … whether known or unknown." (emphasis added). There was no exception listed for fraud.

That the alleged fraud was not known when ADM executed the Termination Agreement also does not preclude release of the fraud action, despite ADM's argument to the contrary. "'[A] release may encompass unknown claims, including unknown fraud claims … [because if] this were not the

case, no party could ever settle a fraud claim with any finality.'" *Yassan*, 708 F.3d at 974–75 (applying New York law) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011)). While Illinois courts more narrowly construe general releases that are unlimited in scope, the release here is not unlimited in scope and is limited to claims arising from the Purchase Agreement. *See Cannon*, 752 F.3d at 1092; *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). Under the broad language of paragraph five, ADM released SGA and its officers from "any and all charges, complaints, claims, … actions, causes of action, … *whether known or unknown*" arising out of or related to the Purchase Agreement. (emphasis added). So by its terms, the Termination Agreement barred claims for any cause of action arising out of the Purchase Agreement, even those not known at the time the Termination Agreement was signed. *See Chubb v. Amax Coal Co., Inc.*, 466 N.E.2d 369, 372 (Ill. App. Ct. 1984). ADM asserts in its complaint that false certifications of potency breached the Purchase Agreement and that the obligation to give accurate representations came from the same agreement, so its current claims arise out of or are related to the Purchase Agreement. (ADM does not dispute this.)

That would seem to end matters. ADM nonetheless maintains that SGA and Yu's alleged fraud during the performance of their business relationship makes the Termination Agreement voidable. As support, ADM points to a decision of the Illinois Appellate Court, *Ainsworth Corp. v. Cenco Inc.*, 437 N.E.2d 817 (Ill. App. Ct. 1982). There, the parties had signed an asset purchase agreement by which the plaintiff agreed to purchase the assets of a subsidiary of the defendant. *Id.* at 819. A dispute arose, and the parties entered into a settlement

agreement. The settlement agreement provided that the representations in the asset purchase agreement expired on the date of the settlement agreement and that the plaintiff waived any breach of such representations that may have occurred in the past. *Id.* at 819–20. A few months later, a government investigation determined that the company's manufacturing process violated federal regulations. *Id.* at 820. The plaintiff then defaulted on the terms of the settlement agreement but argued in court that it had been fraudulently induced to enter into the asset purchase agreement because the defendant misrepresented that it was operating in compliance with government standards. Reversing the trial court, the Illinois Appellate Court ruled in favor of the plaintiff and ruled that the release in the settlement agreement did not bar the plaintiff's claim. *Id.* at 821–22. The court stated it had examined "the circumstances surrounding the execution of the release" and that while a party can waive a defense of fraud by entering into a new contract, knowledge of the fraud at the time of signing the second contract was required. *Id.* at 821. The court also considered the representations to be of a continuing character. *Id.*

We note first that more recently, we traced the "circumstances of the transaction" language used in some Illinois cases concerning releases and by ADM in its brief. We stated that the "Illinois courts of appeal appear to have taken the 'circumstances of the transaction' language from *Parmalee* [*v. Lawrence*, 44 Ill. 405 (1867)] out of context and applied it broadly to allow the consideration of parol evidence in construing the intent of the parties to an unambiguous release." *Cannon*, 752 F.3d at 1091. We found that practice inconsistent with the Illinois Supreme Court, which had "embraced no such rule, instead consistently holding that, when a contract

is unambiguous on its face, the intent of the parties must be construed without consideration of parol evidence." *Id*. To the extent *Ainsworth* relied on parol evidence in its consideration of the release, it is inconsistent with our understanding of the Illinois Supreme Court's jurisprudence.

SGA and Yu respond to *Ainsworth* by emphasizing that an element of a fraud action in Illinois is reliance, *see Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014), and that the Illinois Appellate Court has since distinguished *Ainsworth*. To succeed on its fraud claim in this case, ADM would need to show that it justifiably relied on the truth of a statement made by SGA or Yu. In *Schrager v Bailey*, 973 N.E.2d 932 (Ill. App. Ct. 2012), the plaintiff alleged that the defendant attorneys had committed fraud, and the defendants pointed to a nonreliance clause in the settlement agreement. *Id.* at 935. The settlement agreement stated that no "representations, inducements, promises or agreements" had been made that were not in the settlement agreement and that any prior promises not set out in that agreement had not been relied upon. *Id.* at 934. The appellate court affirmed the dismissal of the plaintiff's complaint, emphasizing that the plaintiff had agreed in the settlement agreement he was relying only on the information it contained and not on any prior statements. *Id.* at 937. The court explained that *Ainsworth* did not help the plaintiff because there "was no issue relating to a nonreliance clause." *Id.* at 938. So, the court said, "*Ainsworth Corp.* provides no support for plaintiff Schrager's argument," and the plaintiff's reliance on *Ainsworth* was "misplaced." *Id.*

Explaining the significance of a nonreliance clause, the *Schrager* court quoted one of our cases, stating, "'[s]ince reliance is an element of fraud, the [nonreliance] clause, if upheld

– and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises—precludes a fraud suit.'" *Schrager*, 973 N.E.2d at 938 (quoting *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 645 (7th Cir. 2002)). That case far from stands alone. As we have noted before, "This court and others have held that a written anti-reliance clause in … [an] agreement precludes any claim of deceit by prior representations." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 992 (7th Cir. 2005).

The Termination Agreement here stated in paragraph nine:

> This Agreement is final and constitutes the complete and exclusive statement with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement. No representations or commitments were made by the parties to induce each other to enter into this Agreement other than as expressly set forth herein. Any amendment, modification, or supplement to this Agreement shall be null and void unless it is in writing and agreed to by the parties ….

This suit was between sophisticated commercial parties. The "ADM" in ADM Alliance Nutrition, Inc. stands for Archer Daniels Midland, one of the largest companies in the United States, and the complaint asserts that the plaintiff is a wholly owned subsidiary of Archer Daniels Midland. Especially when dealing with sophisticated commercial enterprises, "parties to contracts are best served by rulings enforcing the express terms of agreements into which they enter." *Cerabio LLC*, 410 F.3d at 992. While an integration clause alone

may or may not have barred ADM's claims, *see Vigortone AG*, 316 F.3d at 644, a nonreliance clause would. *See Schrager*, 973 N.E.2d at 939 ("We conclude that the integration/nonreliance clause in the Agreement precluded plaintiff Schrager from proving justifiable reliance, which was fatal to his action for fraud."); *Landale Enterprises, Inc. v. Berry*, 676 F.2d 506, 507 (11th Cir. 1982) (per curiam) (cited by *Vigortone AG*, 316 F.3d at 644 as example of nonreliance clause).

ADM's response to *Schrager* is to argue that it only applies to oral communications. But *Schrager* does not limit itself in that way. No language limits its discussion to only oral communications. And written affidavits were at issue in the *Schrager* decision. *See Schrager*, 973 N.E.2d at 937–38. The rationale for barring fraud claims is also the same for both oral and written statements: "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." *Cerabio LLC*, 410 F.3d at 991 (citation omitted).

Further distinguishing this case from *Ainsworth*, there were no continuing representations in this case. Paragraph nine of the Termination and Settlement Agreement cut off the legal effect of prior representations other than those explicitly carved out in the document. ADM argues that paragraph four of the Termination Agreement means that representations concerning the Certificates of Analysis referenced in Section 2.2 of the Purchase Agreement survive the Termination Agreement. We disagree. Paragraph four of the Termination Agreement provides that as of the date of closing, the Purchase Agreement terminates as do all of the obligations,

rights, and duties under it. The only exception is for any pro-
visions or clauses "that by their very terms (including, but not
limited to, Sections 5.2, 5.3, 5.4, 9.2, and 10.1 through 10.3) are
intended to survive the termination" of the Purchase Agree-
ment. Section 2.2 is not listed, and with good reason. Section
2.2 only requires SGA to provide ADM with "a signed and
dated Certificate of Analysis (the 'COA') for each production
lot which shall accompany all Product or Products shipped or
supplied" to ADM from SGA. That is not a duty that by its
terms is intended to survive the end of the Purchase Agree-
ment. The obligation to provide a Certificate of Analysis ac-
companying each supplied production lot no longer exists
when no more production lots are being supplied or shipped.

Section 2.2 also stands in contrast to the sections specifi-
cally listed in paragraph four of the Termination Agreement,
which concern keeping samples (5.2), safeguarding proprie-
tary information (5.3, 5.4), taxes (9.2), and indemnification
(10.1, 10.2). Section 10.3 does state that the "warranties, repre-
sentations, and indemnifications set forth in this Section and
this Agreement shall survive the termination of this Agree-
ment" unless expressly waived, and ADM argues that SGA
and Yu breached this obligation. But there is no warranty or
representation in either agreement that the Certificates of
Analysis accurately reflect the product's potency; Section 2.2
does not even refer to potency. So there were no relevant con-
tinuing representations, and no breach of any obligations un-
der either agreement.

Two sophisticated businesses signed an agreement to
walk away from each other here. ADM chose to relinquish its
right to bring any and all claims arising out of the Purchase
Agreement, whether known or unknown. It also agreed that

no representations were made to induce it to enter into the Termination Agreement other than those contained in the agreement. We agree with the district court that judgment on the pleadings in favor of SGA and Yu on ADM's fraud and breach of contract claims was proper.

### C. No Abuse of Discretion in Award of Attorney's Fees

ADM also appeals the attorney's fees award entered against it. We review an attorney's fee award for abuse of discretion. *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013). The Termination Agreement provided that if a legal action was brought for its enforcement or interpretation, or because of an alleged breach of it, the prevailing party was entitled to reasonable attorney's fees and costs. ADM argues that the fee award was improper because the Purchase Agreement does not have a clause providing for attorney's fees to the prevailing party. But by ADM's own complaint, this case required the interpretation of the Termination Agreement too. Each count of its complaint, for example, sought to recover $750,000 from SGA or Yu, an amount that was based on provisions in the Termination Agreement. We find no abuse of discretion in the award of reasonable attorney's fees and costs to SGA and Yu.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.